## No. XIII.

### SLOO & BYRNE V. POWELL AND OTHERS.

(See Note 38.)

*Appeal from Matagorda County.*

HUTCHINSON, JUSTICE.—This is a voluminous case terminating in one question, arising upon the act regulating attachments, of January 28, 1839.

On the 23d February, 1839, the appellants as a mercantile firm filed their petition, alleging that Powell, on the 24th January, 1837, made three promissory notes to Foster, due at sixty, ninety and 120 days, for sums that amounted in principal to $3962.13; that they were indorsed by the payee to the plaintiffs, who deposited then in the Commercial Bank of New Orleans for collection; that at their maturity respectively, due diligence through a notary was exerted in order to charge the maker and indorser, the evidences whereof are exhibited; that the time of suing, Foster, the indorser was itinerant, without domicile, but then in Matagorda Bay, with goods enumerated, on board the schooner Texas, part of

23 T., 66; Keyser v. Pilgrim, 25 T. Supp., 217; McCulloch v. Renn, 28 T., 793; Oliver v. Robertson, 41 T., 422; Blethen v. Bonner, 93 T., 141; Burnham v. McMichael, 6 T. C. A., 496; Clardy v. Wilson, 24 T. C. A., 196. Title to property given to either of them while migrating from one State to another is

which goods were in the possession of Belknap, a citizen of that county, who had colluded to alter the manifest of the goods or ship, so as to make them appear to be his; and praying that Powell, Foster, Belknap, with Shackelford, the master of the schooner, should be impleaded; presenting interrogatories to the two latter persons; that an attachment should be issued; that the defendants should be decreed to pay the amount, etc. Byrne, one of the plaintiffs, on the same day (February 23, 1839) made affidavit as the basis of the attachment against the goods, and gave a bond, with a surety, payable to *all* of those impleaded, with condition substantially conforming to the bond prescribed in the statute referred to.

On the same day citations were issued, all of which were served; and an attachment against Foster's estate was also issued, and on the day following was levied. On May 31, 1839, Foster replevied the goods by giving bond of that date to both plaintiffs in the penalty of $8000. At October term, 1840, the bond to prosecute the attachment was quashed and a new bond ordered to be given nunc pro tunc; and the exceptions taken to that action of the court shows that the ground assumed for quashing was that the bond was not given alone to the actual defendant, Foster. There was a motion to quash the attachment but it was overruled. On the 16th October, 1834, the new bond required was given by Byrne as principal, with a surety in the penalty of $8000, payable to Foster, his heirs, etc., and to be void on condition such as is prescribed in the attachment law. On the 6th October, 1841, on the seventh and eleventh days of that month successively, the court below quashed the last bond, on the ground that it was not signed by all the plaintiffs; from which they prayed an appeal. The attachment was quashed for want of sufficient bond, and it was decreed that the plaintiffs should recover of Powell and Foster the amount of the notes with interest on each, from their maturity, with costs. The only question raised in the court below or presented on the brief of the counsel for revision here is, whether the district court erred in quashing the last bond.

The suit originated at a period when the Spanish law, based on the civil law was in force here; and it is manifest from the verbiage of the attachment and of both bonds, that the act concerning attachments of the 28th January preceding, was promulgated at Matagorda and was before the counsel of the plaintiff at the filing of the petition.

It will be recollected, too, that the principles of the English jurispru-

determined by the laws of the latter. State v. Barrow, 14 T., 179. Property acquired while temporarily sojourning in another State is determined by the laws of their domicile. Edrington v. Mayfield, 5 T., 363. Purchaser of wife's separate property from husband, or through execution sale against him, with notice of wife's rights, takes no title against her. Parks v. Willard, 1 T., 350; Bennett v. Cocks, 15 T., 67; Smith v. Boquet, 27 T., 507; Kirk v. H. D. N. Co., 49 T., 213; French v. Strumberg, 52 T., 92; Morrison v. Clark, 55 T., 437; Baker v. Baker, 55 T., 577; Cline v. Upton, 56 T., 319; John v. Battle, 58 T., 591; Legierse v. Moore, 59 T., 470; Parker v. Coop, 60 T., 111; McKamey v. Thorp, 61 T., 648; Ross v. Kornrumpf, 64 T., 391; Kempner v. Comer, 73 T., 196; Montgomery v. Noyes, 73 T., 203; Evans v. Welborn, 74 T., 530; Parker v. Fogarty, 4 T. C. A., 615; Clardy v. Wilson, 24 T. C. A., 196. If purchaser has no notice of wife's rights, he takes a good title against her. Mitchell v. Marr, 26 T., 329; Cooke v. Bremond, 27 T., 457; Kirk v. H. D. N. Co., 49 T.,

dence regulating the course of civil prosecution, and separating the ordinary from the extraordinary form, had not been introduced. The court had cognizance of the subjects or matters of the complaint; and as the parties have stirred no other question here, we may proceed singly and at once to inquire, was the last bond valid under the attachment law? We think it was, and that the court below erred in quashing it.

The inquiry leads us into an examination of the first bond, and the disposition made of it. By the law existing when it was given, a plaintiff might implead all the persons connected with the transaction, and was not put on the strict rule of the common law requiring that in an action ex contractu only those bound or liable should be sued, and those, too, liable in the same degree. Here as well the maker as the indorser of the notes were sued; and so were Belknap and Shackelford upon alleged interest in the goods of Foster, or fraud and collusion with him concerning them. We are therefore not prepared to say that the first bond was such as afforded the principal defendant, Foster, no available security. Indeed we believe that in view of the law then prevailing it was valid security, so that although the court below erred in quashing it, there was no error in the refusal to quash the attachment; and as the security required by the defendant Foster was afforded by the new bond ordered by the court, he ought to have been contented with it, especially if in all other respects it conformed to the requisitions of the attachment act and was such as his motion recognized as good. It is true, as urged by the appellee's counsel, that attachment laws whose operation is in rem, being mostly ex parte, should receive a rigid interpretation, and should not be applied to cases not within their plain and obvious meaning. It is also true that at common law one partner can not bind his associate without his consent, by signing the associative name to a seal; for in that case, only he who signs is bound. And though this rule did not apply to the bond in question, it may be conceded that the name of Byrne, as in favor of the obligee, did not in any degree bind Byrne's partner. By the act, however, the party or his agent, attorney or factor might take the oath required to obtain the attachment; and if the agent, attorney of factor might make the affidavit, assuredly one of the plaintiffs might make it. So, too, with the bond. It was allowed to be given by the plaintiff, his agent, attorney or factor; and if it was sufficient for a third person as agent, attorney or factor to give it, was there, or can there ever be, any reason why one of the plaintiffs should not give it? What was the object? To furnish the adverse party a collateral security that should be sufficient. It could never be pretended that either of the obligors could

213; McKamey v. Thorp, 61 T., 648; Ross v. Kornrumpf, 64 T., 391; Rousel v. Stanger, 73 T., 670; Stiles v. Japhet, 84 T., 91; Kirby v. Moody, 84 T., 201; Coleman v. Bank, 94 T., 605; Russell v. Nall, 2 T. C. A., 60; Sanburn v. Schuler, 3 T. C. A., 629; Sinsheimer v. Kahn, 6 T. C. A., 143; Swink v. League, 6 T. C. A., 309; Watts v. Corner, 8 T. C. A., 588; Coleman v. Bank, 17 T. C. A., 132; Hord v. Owens, 20 T. C. A., 21; Kilgore v. Graves, 2 App. C., sec. 410; Ross v. Dailey, 1 U. C., 251. Must be a purchaser for value. Barnes v. McArthur, 4 T. C. A., 71. Purchaser who is a creditor of husband and credits amount of bid on judgment, is not an innocent bona fide purchaser as to the wife. Deles-

ever urge as an objection to a recovery on the bond that the partner of the principal obligor was not joined. In Cayce v. Curtis and Cayce v. Horton, January, 1841, we decided that a seal was not required to render an instrument given as a statutory bond obligatory, previous to the introduction of the body of the common law; and that as the party had chosen to bind himself, so he should be bound. Holding it proper to give a strict construction to the act, we yet consider that under its third section, if either or any of several plaintiffs executes a good and formal bond, with sufficient surety or sureties, it is a security *by* the plaintiffs, although *all* of them do not sign as principals; and is as available a statutory security as if given or furnished by an agent, attorney or factor. Foster had been cited, had replevied the goods attached, and as the object of the process was to bring him into court or reach his property, it was too late to move to quash the attachment at the term next after the return term. The statute authorizes a plea in abatement, and that ought to have have been filed at the first term. A motion to quash is indeed in the nature of that plea and ought to be made with equal diligence. We are not prepared, however, to say that if a plaintiff in an attachment case is prepared and offers to give such bond as the court may require for the perfect security of the defendant, and if this be done previous to the decision of such motion or plea, it ought not to be received. The current of modern decisions seems to allow it to be done generally, because the object of the bond is to secure collaterally the obligee, and because there should be but one suit, if possible, on the same demand or complaint. If a defendant in an attachment be not cited, we should proceed with strictness and vigilance for his security.

The appellants, therefore, on these principles must be restored to their rights under the levy of attachment and replevy bond; but as the case has not been tried on a plea to the merits, but has been decided erroneously in part below on preliminary questions, the judgment must be set aside and the cause remanded. We will not omit noticing that in the judgment rendered it was particularly proper not to compound the interest, but to give judgment for it from the dates of the maturity of the notes, respectively, until payment.

*Reversed and remanded.*

Concurred in by Chief Justice John Hemphill, Judge R. E. B. Baylor and John T. Mills. Judges R. Morris and C. P. Jack dissenting.

---

pine v. Campbell, 52 T., 4; Wallace v. Campbell, 54 T., 87; Bonner v. Stephens, 60 T., 616; McKamey v. Thorp, 61 T., 648; Stoker v. Bailey, 62 T., 299; Ross v. Kornrumpf, 64 T., 390; Yoe v. Montgomery, 68 T., 338; McCutchen v. Purinton, 84 T., 603; Russell v. Nall, 2 T. C. A., 64; Cleveland v. Mills, 6 T. C. A., 479; Burnham v. McMichael, 6 T. C. A., 496; Cobb v. Trammell, 9 T. C. A., 527; Brown v. Marwitz, 10 T. C. A., 458; Mexia v. Lewis, 12 T. C. A., 102; Aultman v. George, 12 T. C. A., 457; Ryan v. Engelson, 26 T. C. A., 192.

**Note 22.**—Andrews v. Andrews, p. 427.

An appeal does not lie from an interlocutory decree or judgment nor from a judgment that does not settle all the issues as to all of the parties. Soy v. McMullen, Dal., 363; Robinson v. Bailleul, 2 T., 160; Ewing v. Kin-

## No. XIV.

### SELKIRK v. BETTS & CO.

(See Note 39.)

*Appeal from Matagorda County.*

HUTCHINSON, JUSTICE.—Betts & Co. made their note to McLellan of November 2, 1839, payable at one day. After maturity it was assigned to Selkirk, having credits on it reducing it to $178.16. The assignee sued the makers to recover that residue. They pleaded payment before suit, without stating to whom. The court instructed the jury that a set-off or failure of consideration was a good defense against the assignee suing on a note assigned to him after its maturity, and that in regard to any promise made to the assignee after transfer to pay the note to him, it was a new contract on which he should have sued, so that the testimony on that score should be disregarded. The jury found that the makers were entitled to a set-off, at or before the transfer of the note, to $208.13, but that after transfer they promised the holder to pay the note. The judgment on this verdict was for the costs of the defendants. Without noticing specially the points presented on the brief of the learned counsel, we will state the principles we think applicable to the case. The Act of 1840, concerning negotiable instruments, discounts and set-offs, should not have been consulted as the rule of decision. Legislation affecting rights can not be retrospective, though enactments changing the remedies may be enforced upon pre-existing rights. The rights of these parties were and still are determinable according to the civil law, because the note and evidences of payment or set-off on the transcript seem to have arisen prior to the act mentioned, and to that introducing generally the English common law.

The suit was well brought on the note. It was not necessary for the plaintiff to have noticed any subsequent promise of the makers to pay its amount or the balance to him; on the contrary, if the defendants had actually paid the note to the payee before notice of transfer, testimony of the fact would have been admissible under the plea of payment pleaded, and evidence of the promise would have been good countervailing proof if it had been made by the defendants when not under mistake of the facts or of their rights. If the defendants relied on a cross-demand, matured against the payee before notice of assignment, they ought to have pleaded it, so as to have notified their adversary. He then could have replied the subsequent promise to pay him or given evidence of it. In reference to the requisites of the allegata, a promise to pay a debt barred by prescription, or a statute of limitation, or a promise to pay to the assignee or

nard, 2 T., 163; Gross v. McClaran, 8 T., 341; Hicks v. Gray, 25 T., 82; Martin v. Crow, 28 T., 613; Simpson v. Bennett, 42 T., 241; Taylor v. Fore, 42 T., 256; Rodrigues v. Trevino, 54 T., 198; Linn v. Arambould, 55 T., 611; Whitaker v. Gee, 61 T., 217; Bradford v. Taylor, 64 T., 169; Wootters v. Kauffman,

holder of a chose in action is not a new contract, nor is there any need for a new or cumulative cause or consideration to support it, although it has been sometimes so decided; it is only a recognition of a subsisting obligation, for in the one case, though the remedy is precluded by lapse of time, the morality of the duty to be performed remains; and in the other, the party is presumed to have either no defense or to have waived the assertion of it.

In the case before us the court below erred in permitting evidence of a counter demand without an allegation on which to support it; in charging the jury that the plaintiff ought to have averred the promise to pay the note; and in not instructing the jury in regard to the traits necessary to give vitality to such promise. Such promise in order to be effectual must be understandingly made. If the makers of this note when ignorant of the fact of an existing cause of cross-action, or when laboring under a delusion or misconception of their right to avail of it, promised payment to the holder, it was precisely such a promise as no just law ought to enforce; but if made upon knowledge of the fact and of their right, it gave efficacy to the note in the hands of the holder, and the makers must resort to the payee, their debtor on their account. This principle of the Roman, Spanish, English, and we may say American law, is too firmly established to be controverted. It has been adopted as a doctrine of Texian jurisprudence in the case of Hall v. Phelps, January, 1841. The judgment, therefore, must be reversed and the cause remanded.

This cause coming on the heard on the transcript of the record in the District Court of Matagorda, and it being inspected and the arguments of counsel heard, because it seems to the court here that there is error in the judgment below, it is therefore considered that the same be reversed; that this cause be remanded, with discretion to the said district court to allow the appellees to plead farther to the merits, and thereupon to try the cause upon the principles in this court declared; and it is further considered that the appellant recover of the appellees his costs herein in this court expended; and that this decision be certified below for observance.

*Reversed and remanded.*

---

67 T., 488; Lumber Co. v. Williams, 71 T., 444; Mignon v. Brinson, 74 T., 18; M. P. Ry. v. Scott, 78 T., 360; Darnell v. Lyon, 85 T., 455, 465; Land Co. v. Winter, 93 T., 560; R. R. Commission v. Weld & Neville, 95 T., 278 (overruling R. R. Commission v. Weld & Neville T. C. A., U. R. C., 1902); Mills v. Paul, 1 T. C. A., 419; Mills v. Paul, 4 T. C. A., 503; State National Bank v. Waxahachie National Bank, 14 T. C. A., 143; Davis v. Martin, 15 T. C. A., 62; Walker v. Mears, 28 T. C. A., 210; Lay v. Bellinger, 1 App. C., sec. 24; Giersa v. Yocum, 1 App. C., sec. 310; Stephenson v. Tennant, 1 App. C., sec. 543; Wheeler v. Davis, 3 App. C., sec. 13; Carswell v. Crowther, 4 App. C., sec. 153; White v. Smith, 4 App. C., sec. 225; Wadley v. Johnson, 2 U. C., 739; Masterson v. Williams (T. Sup.), U. R. C., 1889; Frank v. Tatum (T. C. A.), U. R. C., 1892; Burch v. Burch (T. C. A.), U. R. C., 1894; Burrows v. Cox (T. C. A.), U. R. C., 1896; Davis v. Martin (T. C. A.), U. R. C., 1896. In such cases, appellate courts will dismiss the appeal on its own motion. Messner v. Lewis, 17 T., 519; Holek v. Varona, 63 T., 65. When one of the defendants dies before trial, it will be presumed in favor of finality that the case was dismissed as to him. Smith v. Wilson, 18 T. C. A., 24. Appellate court may revise an

## No. XV.

### JOHN SMITH v. THE REPUBLIC.

*Appeal from Liberty County.*

JACK, JUSTICE.—The appellant, John Smith, was at the fall term of the District Court for Liberty County indicted and tried for the murder of James West. Upon the trial in the district court the defendant's counsel moved the court to instruct the jury "that the indictment was, as it was framed, an indictment for manslaughter only and not for murder," which instruction the court refused, and charged the jury "that it was an indictment for murder, and that upon the bill the defendant might be convicted of murder." To this opinion of the court the defendant by his counsel excepted.

The only question which we deem it necessary to determine in this case is, was this indictment for murder or manslaughter?

The second section of the act punishing crimes and misdemeanors provides "that every person of sound mind and discretion, who shall willfully and maliciously kill any person, shall be deemed guilty of murder," etc.

The indictment before us was framed under this statute, and containing the usual requisites, concludes with these words, "and so the jurors aforesaid upon their oath aforesaid do say, that the said John Smith, him the said James West in the manner and by the means aforesaid, feloniously, willfully and maliciously, did kill and murder."

It was well settled that an indictment under a statute must follow and conform to the statute in stating the offense.

The indictment before us we think is strictly in accordance with the provisions of the statute before alluded to. It is an indictment for murder, and the judge did not err in his charge to the jury. The judgment of the district court is therefore affirmed.

*Affirmed.*

## No. XVI.

### STOCKTON v. MONTGOMERY.

(See Note 40.)

*Appeal from Colorado County.*

HUTCHINSON, JUSTICE.—The main question, whether the Act of January 19, 1841, constituting the territory of Ward, conforms to the Constitution, is plainly, directly and formally presented for our determination. If we hold it to be a valid act, the territory of Ward will

---

interlocutory order of lower court refusing to proceed with the cause, and correct errors by mandamus. Kleiber v. McManus, 66 T., 48; Schultze v. McLeary, 73 T., 92; Grigsby v. Bowles, 79 T., 138; Fannin County v. High-

have passed through all the prescribed ordeals, and its future course as a civil division of the nation may not be disturbed on the question now to be adjudicated. If a majority of this court can not validate the act, or a majority shall decide that it is in conflict with the constitutive law, then we are to solve a secondary proposition, whether an act passed by the senate and house of representatives, carrying out a civil division of the Republic, is a political act that is final, conclusive, and not receivable by the judiciary.

1. I will consider if the act be constitutional. Dismissing all prelude about the importance of the subject and the consequences of its judicial solution, and desiring to bring into the investigation a mind directed honestly, anxiously and exclusively to the question, unawed by present or future extraneous considerations, I will speak frankly, respectfully and courteously of the legislative and executive branches of the government, but always in the spirit of the maxim, "Veritas nihil veretur, nisi abscondi."

Opening the Constitution and grouping the sections concerning counties and the representatives and functionaries of counties, we may more clearly discern how they harmonize, what they establish, what they forbid. "The house of representatives shall not consist of less than twenty-four nor more than forty members, until the population shall amount to one hundred thousand souls; after which time the whole number of representatives shall not be less than forty nor more than one hundred; provided, however, that each county shall be entitled to at least one representative." Const., art. 1, sec. 5.

"The clerks of the district courts shall be elected by the qualified voters for members of Congress in the county where the courts are established." Id., art. 4, sec. 6.

"There shall be in each county a county court, and such justices' courts as the Congress may from time to time establish." Id., sec. 10.

"The Republic shall be divided into convenient counties, but no new county shall be established, unless it be done on the petition of one hundred free male inhabitants of the territory sought to be laid off and established, and unless said territory shall contain nine hundred square miles." Id., sec. 11.

"There shall be appointed for each county a convenient number of justices of the peace, one sheriff, one coroner, and a sufficient number of constables," etc. Id., sec. 12.

"The Republic of Texas shall be divided into convenient judicial districts, not less than three nor more than eight; there shall be appointed for each district a judge, who shall reside in the same, and hold the courts at such times and places as Congress may by law direct." Id., sec. 2.

---

tower, 9 T. C. A., 293; Schintz v. Morris, 13 T. C. A., 580. After final judgment, interlocutory may be revised on appeal. Gross v. McClaran, 8 T., 341; Stewart v. Jones, 9 T., 469; Stewart v. State, 42 T., 242; Holek v. Varona, 63 T., 65; O'Neal v. Bank, 64 T., 644; Fort Worth Ry. v. Rosedale Ry., 68 T., 163. Act of November 1, 1871 (Gammel's Laws of Texas, vol. 7, p. 17),

"Until the first enumeration shall be made, as directed by this Constitution, the precinct of Austin shall be entitled to one representative, etc. Id., art. 7, sec. 6.

The framers of the Constitution must be understood to have employed words in their natural sense, and to have *intended what they said;* and to ascertain the powers granted or objects declared, the only rule is to consider the language of the charter granting or defining them. All will agree to this. It is the first process suggested to every intelligent and pure mind; it is a natural impulse; and it is a rule of judicial action declared in the great case, Gibbons v. Ogden, 9 Wheaton, 1, 5 Cond. Rep., 562. Another rule coeval with jurisprudence is that the written positive law shall be so construed as to be rendered operative; and that that and all the provisions on the same subject shall be considered together and made to harmonize, if reasonably and justly they may; and moreover, that the utmost reasonable, just and practicable effect and scope shall be given to each. This no one can controvert. Now all the sections quoted are exceedingly plain. It seems to me that no one can misunderstand them. There is no obscurity on which to ponder and doubt. There is no ambiguity to be explained; nor is there *now* any perceivable conflict. There was in the formation of the instrument an accidental incongruity, but it ceased with the adoption of the instrument, and it is now wholly unimportant; it is this: the minimum of representatives in the house according to the first clause is twenty-four, and by the last it is thirty-two. But as the last is couched in terms of limitation as well as the first, and is moreover more specific than the first, we should regard the last as declarative of the true minimum; and this, too, because it was favorable to a more numerous representation. If the Convention contemplated a period when Congress might reduce the number to twenty-four, it precluded that result by giving to the territory then embraced by the existing precincts thirty-two, until the enumeration should be made as directed by the Constitution—an enumeration nowhere indicated, unless by the first clause in order to the ascertainment of the 100,000 souls. The minimum of twenty-four, therefore, was superseded by that of thirty-two by the instrument itself.

In every other particular the sections quoted harmonized, and each can be rendered fully operative. The second section of the fourth article could be enforced until the population should become so immense, and the eight districts, as the highest number of judicial districts, so crowded with people and consequent litigation as to render the maximum of eight for such districts incompatible with the term *convenient,*

---

authorizing appeals from interlocutory judgments, held void. Ward v. Ward, 37 T., 389; City of Paris v. Mason, 37 T., 447; Dial v. Collins, 40 T., 367. Nor from an order overruling motion for new trial, nor until after final conviction. Shannon v. State, 7 T., 492; Lawrence v. State, 14 T., 432; Burrell v. State, 16 T., 147; O'Connell v. State, 18 T., 343; Calvin v. State, 23 T., 577; Nathan v. State, 28 T., 326; Dooly v. State, 33 T., 712; Murray v. State, 35 T., 472; Fulcher v. State, 38 T., 505 (overruling Nelson v. State, 32 T., 71; Hoppe v. State, 32 T., 388); Mayfield v. State, 40 T., 289; Anschincks v. State, 43 T., 587; Young v. State, 1 T. App., 65; Smith v. State, 1 T. App., 408; Butler v. State, 1 T. App., 638; Choate v. State, 2 T. App., 302; Butler

and to require an amendment of the Constitution in order to the execution of the laws and the administration of justice. So the sixth section of that article is not only enforcible, but expressly explodes as impossible the assumption that there can be a county without a representative; for if the clerk of a district court is to be elected by the qualified voters of the member of Congress in the county where his court is established, it follows that his county must have a member in Congress, thus plainly showing what the Convention clearly expressed in the first section in review, that in all cases—as a continuous limitation and essential element in the structure of counties—"each county shall be entitled to at least one representative." The tenth section of the fourth article can operate harmoniously with the first section in giving a county court and justices' courts as the third and fourth elements of a regular county; and so of the twelfth section of the fourth article in giving other county officers as a fifth element—a sheriff, a coroner, justices and constables. Coming to the eleventh section of the fourth article, we find the sixth and seventh components of a county,—it must have at least 100 free male inhabitants, and must contain at least 900 square miles in area; these are the minima in relation to its population and territory. Now as in mathematical demonstration and physical science we say of a given space that is divisible, or of a body composed of parts, that any number of the fractions or components of the whole is not the entirety, so in constitutional law, it is an axiom that though six out of seven of the elements required to constitute an institution be given, if the seventh be denied, the institution is not created, but the attempt to form it a nullity. The act denies to the territory of Ward a separate representative, the first, the highest and the most important right of a county.

I have thus assumed as the natural sense and plain meaning of the fifth section of the first article, that each county at each period mentioned, at all times during the subsistence of the Constitution, must have at least one representative. Look again at that section. It is but one sentence. The idea it expresses is distinct and clearly the same to every intelligent reader at the first perusal. It fixes the minima and maxima of representatives during two epocha: the first, that *before* the population shall amount to 100,000, and the second, that *after* that event or attainment, and concludes with a limitation alike applicable to both; the number shall be so and so until that event, after which it shall be specified—"provided, however, that each county shall have a representative." No philologist could express the same idea or train of ideas in simpler or clearer phrase. If the limitation of the county right is to be

v. State, 2 T. App., 529; Robinson v. State, 3 T. App., 47; Lablaite v. State, 4 T. App., 169; Pennington v. State, 11 T. App., 281; Darnell v. State, 24 T. App., 6. In the following instances, judgments are not final and can not be appealed from: (a) Only for costs. Hanks v. Thompson, 5 T., 6; Warren v. Shuman, 5 T., 441; Scott v. Benton, 6 T., 322; Hancock v. Metz, 7 T., 177; Bradshaw v. Davis, 8 T., 344; Fitzgerald v. Fitzgerald, 21 T., 415; Martin v. Wade, 22 T., 224; Holt v. Wood, 23 T., 474; Green v. Banks, 24 T., 522; Neyland v. White, 25 T., 319; Patterson v. Hall, 30 T., 464; I. & G. N. Ry Co. v. Smith County, 58 T., 74; Eastham v. Sallis, 60 T., 576; American, etc., Co. v. City of Crockett (T. C. A.), U. R. C., 1899. (b) Overruling motion to

understood as applying to both epocha, as is the natural and obvious import of the words and the structure of the whole sentence, there is no need of any other word or words to be introduced by implication, for the meaning is perfect from the words used; and we have seen that according to one of the highest authorities we must adopt the natural sense of the provision. We have seen, too, that by taking the section to mean what it manifestly declares, it can operate effectually and in harmony with every other section and clause of the Constitution.

If we assume that the concluding limitative clause of the fifth section of the first article applies only to the second epocha, what follows? First, to do so, we depart from the rule of right reason declared in Gibbons v. Ogden. Secondly, we are constrained to add words to a sentence already perfect, and radically change its natural import; and that, too, to produce discord instead of harmony, for if the Convention intended the limitation to refer to the clause giving the second epoch, and to that alone, the concluding words would have been "provided that in the latter case," and not "provided, however, etc.," or some equivalent qualifying word or phrase. Thirdly, on that violent interpretation the sixth section of the fourth article would have been rendered inoperative during the first epoch; for until the population should amount to 100,000, as counties might be formed without representation, so district clerks for such counties would have to be elected by voters not entitled to elect a representative. Fourthly, as only eight judicial districts and a judge for each could be had, the judicial counties could be so multiplied as to render the official duties of the judges too oppressive to be performed, and thus under a mere coloring of the Constitution the Legislature could subvert the judiciary, when the grand object of the Constitution was to organize and perpetuate a government of three co-ordinate but independent branches. Thus the number of counties could have been extended to 104, or thirteen to each judge; and giving one week's court twice a year to each county, he would have been put in the stirrup six months each year to hold the district courts alone. But the counties could have been increased indefinitely until a national assembly should have been found sole occupants of the citadel, to make, expound and execute the law! The Convention did not open this door to encroachment. Fifthly, to show that it was intended that at all times each county should be separately represented, at the commencement no precinct was left unrepresented. Sixthly, there are four civil divisions of the Republic named, three of which are for judicial and other purposes: first, senatorial districts, one of which may consist of two or more counties, the district of a representative being only

---

quash writs of certiorari and attachment. Messner v. Lewis, 17 T., 519; Hamman v. Lewis, 34 T., 474; Holek v. Varona, 63 T., 65. (c) Quashing writ of sequestration. Little v. Morris, 10 T., 263. (d) Quashing indictment. State v. Paschal, 22 T., 584; State v. Thornton, 32 T., 104. (e) Order granting change of venue and order remanding case to court granting it. Wygall v. Treasurer, 33 T., 328; Vance v. Hogue, 35 T., 432. (f) Refusal to enter final judgment on verdict. Lane v. Ellinger, 32 T., 369. (g) Order of justice of peace dismissing suit for want of prosecution. Morgan v. John-

one county; then the judicial districts, to be composed of counties; then counties; and lastly company beats, or justices' precincts. So far as divisions are expressly required, none others for the same purposes can be established—for expressio unius est exclusio alterius. Those required must be organized and kept, each as nearly equal to one another as practicable, and all alike for the same purpose. Now look at the confusion of such a county as Ward. It is invested, we may assume, with a full machinery of judicial administration and internal economy and police, for so from the words of the act it would at first seem; but when its citizens assemble as electors of a representative to Congress, its own officers do not order and conduct the election, for here in one quarter of Colorado and in another Matagorda takes the power and sends her sheriff, judges and clerks of election; Ward being subjected to two extraneous powers and civil platoons of officers, and her people separated into squads, voting not for one but for two members of Congress from different counties. If such a judicial county were formed on the point of intersection of four regular counties, the confusion would be duplicated. Were these confusion and confliction of lines, powers and rights intended by the Constitution? That it was intended in fact by the Convention is perfectly incredible. But how are rights affected? Has James S. Montgomery the same privileges and benefits, arising from and protected by the Constitution and laws, that are enjoyed by any citizen of Colorado? Can he exercise and enjoy all of his constitutional and civil rights in the same degree—under equal circumstances? Plainly and certainly not. He approaches the ark of liberty—the ballot box— not in community with his compeers, with whom he actually is associated in the performance of all his other municipal and domestic relations, but in a corner and in conjunction with strangers and under a distant and separated surveillance. Not so the man of Colorado. The inequality is marked. Again, are his advantages in a county not separately represented by a member bound to utter and vindicate in the national hall the distinct interests and instructions of himself and compeers equal to those he might enjoy under such separate representation? Plainly and certainly not.

Then *all* his municipal and social rights are impaired. He is sued in Ward territory. He says he is a citizen resident in Colorado County, a civil division duly made and fully represented; but that his domicile has been unlawfully separated from it, and though he occupies the same locality, it is disfranchised. Is not this true? And what is the true name and nature of the right thus violated? It is evidently a municipal

son, 4 T., 117. (h) Order dismissing petition of intervention. Stewart v. State, 42 T., 242. (i) Order granting motion to remove cause to Federal Court. Appeal lies from refusal of motion. Rosenfield v. Condict, 44 T., 464; Durham v. Southern L. I. Co., 46 T., 182; Walker v. Howard, 10 T. C. A., 611. (j) Judgment against sureties alone on bail bond, and refusal of judgment on. Moore v. Schooner Anna Maria, 11 T., 655; Cox v. State, 34 T. Cr., 94. (k) Order allowing continuance. Dow v. Hotchkiss, 2 T., 471; Tinsley v. Trimble, 35 T., 425; Taylor v. Fore, 42 T., 256. (l) Granting new trial. Stewart v. Jones, 9 T., 469; Huston v. Starr, 12 T., 424; Goss v. McClaran, 17 T., 107; Dial v. Collins, 40 T., 367; Long v. Garnett, 45 T., 400;

right. The statute required his creditor to sue him in his own county. That county is Colorado, not diminished in extent by the void act in review. Hence we perceive that Ward territory is not his true civil division, not his forum, not even a constitutional entity. It is admitted by all the learned counsel who have argued the question arising that though one hundred competent men residing within the proper area concur in the voluntary abandonment of the rights and immunities resulting from an integral and fully represented county in order to enjoy them in restricted degree and different circumstances, it can not affect another man residing in the same space; and that if the act thus obtained does so affect him, this alone determines its invalidity.

For these six reasons, with others that might be offered, I feel constrained to declare my utter inability to entertain for a moment the argument, that the concluding clause of the first provision in review qualifies only the case or epoch of the section. I can not hesitate as to the entire meaning of the section and its full scope, nor can I perceive how a doubt can be held about it. But in making this conscientious declaration, I feel the most unfeigned conviction that not only a doubt may arise in another's mind with equal conscientiousness, but a different conclusion attained. I forget not the established principle of construction of a constitutional provision, that upon a reasonable doubt whether the legislation under it accords, the latter is to be supported as being compatible with the former; a principle resting on the respectful confidence to be reposed in the probity and wisdom of a co-ordinate branch of the government acting under the same solemn sanctions. But when the conviction is clear, as is mine, the duty to condemn the unwarranted legislation is imperious. The obligation of allegiance is to support the constitutive law; and that obligation is rendered eminently imperative upon this court, the last and special depository of the charter of the nation's conventional will, and its peculiar guardian against all infraction.

2. I now come to the question whether the statute before us is such an exertion of the *political* power of the legislative as excludes the judicial scrutiny and authority of the government. The immediate etymon of *political* is *politics,* which is the art and science of government; the regulation of man in his relations to the State; the theory and practice of obtaining the ends of civil society as perfectly as possible. In common speech and sense we mean by the politics of a country the course of its government in its internal and external relations, more especially the external or international; so that in its comprehensive acceptation it embraces every subject of positive law. In this last sense the act

Morehead v. I. & G. N. Ry. Co., 46 T., 178; G. C. & S. F. Ry. Co. v. James, 73 T., 12; Hamilton v. Prescott, 73 T., 565; Schintz v. Morris, 13 T. C. A., 580; Hume v. Schintz, 16 T. C. A., 512; Lay v. Bellinger, 1 App. C., sec. 23. (m) Setting aside order discharging guardian. Lehman v. Gajusky, 75 Texas, 566. But may appeal from denial of motion to set aside appointment. Arthur v. Read, 26 T. C. A., 574. Adoption of the common law by the Act of January 20, 1840 (Gammel's Laws of Texas, vol. 2, p. 177), brought with it the writ of error. Bailey v. Haddy, Dal., 376; Moore v. Harris, 1 T., 36. With us it is not the institution of a new suit but only a mode of appeal. Creek v. Rogers, 1 T., 440; Smith v. Gerlach, 2 T., 424; Luckett v. Townsend, 3 T., 119; Lacey v.

before us is a political act, as is every other act of the Legislature either with or without the concurrence of the executive, and every act of the executive in the view of what is the course of the government. But when we proceed to ascertain the essential nature of a legislative act and its concord with the Constitution, it is quite plain that this cognovit can afford no possible criterion—none conceivable! Names that represent things truly become their proper representatives and there is substance in them. Names that do not import the nature and essence of things exactly are ever delusive. They may be false simply when not producing vicious effects, fraudulently false when fraught with mischief, and in the worst degree, criminally false. In every way they are unfit for human use. "Call a spade a spade."

What is the Constitution? It is the basis on which the government rests—the authority for all law—and is the commission under which the Legislature, the executive, and the judiciary act. It is permanent and not influenced by the temper of the times. Whatever the collisions of opposite interests, the virulence of parties and the conspiracies of corruption, public robbery and treason, it continues like the Himalaya or the Andes, amidst and above the storm,—the nation's destiny dependent upon its subsistence. If a legislative act impugn its principles, the act must yield; and whenever it is brought before the court it must be declared void. Nay, the act is inherently nothing. 2 Dall., 304; 1 Cran., 175.

Its grand objects were to establish, organize and sustain a government of three co-ordinate, independent branches, each acting within a defined and fixed sphere; but the exertion of their respective powers, whether on one and the same or separate subjects, always to concentrate to the beneficial ends of national security and civil liberty; the first branch to legislate, the second to approve, and as chief magistrate to execute in general the acts of the first branch and conduct the government during its recesses; and the third in the last resort to expound and enforce the laws in every detail and particular of violated public and private right. And the Constitution, like the sun in the center of the solar system, was to hold all the planets within their orbits, sustain and vivify them, and shine equally on the inhabitants of each. This general principle may be found in Fairfax v. Hunter, Wheat., 304. In Wilkinson v. Leland it was asserted to an attentive world that no government could be scarcely deemed free when the rights of the people were left solely dependent on the will of the legislative body without any restraint. 2 Pet., 657. I am fully warranted, from these and other numerous expositions of a Constitution from which ours is mainly copied,

---

Ashe, 21 T., 394; Rodgers v. Alexander, 35 T., 116; Hart v. Mills, 38 T., 513; Magee v. Chadoin, 44 T., 488; Harle v. Langdon, 60 T., 555; Moore v. Moore, 67 T., 293; T. T. Ry. Co. v. Jackson, 85 T., 605; G. H. & W. Ry. Co. v. Lacy, 7 T. C. A., 63; Hart v. State, 13 T. App., 555.

**Note 23.**—O'Connor v. Van Homme, p. 429.

Plaintiff can not recover on quantum meruit when suit is upon a contract. San Antonio v. Lewis, 9 T., 69; Gammage v. Alexander, 14 T., 414;

to declare that the judiciary is not only a co-ordinate branch of the government, but a check interposed to keep the other branches, not indeed within the limits of a sound and safe policy or of any policy at all, for that we shall see is exclusively intrusted to the other branches, but to constrain them to keep within the letter and spirit, the requisitions, the limitations, and landmarks of the immutable constitutive law; that the exertion of this great and paramount duty is essential to the existence and transmission of freedom; and that this court is the last resort in which the rights of the people are protected, the Constitution vindicated, and the government preserved. Among the powers granted to each house of Congress are the power to judge of the election, qualification and return of its members; to adopt its rule of proceeding; to punish internal disorders; to expel a member; and to imprison persons, not members, for disrespect. In the argument these have been called *political powers;* but it is plainly a misapplication of terms. They are *exclusively constitutional powers.* Neither the executive nor the judiciary can have any possible control over either house in its execution of any one of such powers, nor directly arrest, suspend, or supervise the action or decision, *so as to coerce a different result.* How far it might be competent for the judiciary in a case presented for the writ of liberty or in one inter partes, based on the alleged violation of the constitutional and absolute right of the citizen by such decision or action, to interpose, need not be mooted before it arises; but it may be assumed that the house whose decision or action should be impugned could never be impleaded. Such is the power given to the house of representatives to prefer impeachments; and in the trial of impeachments the senate is the court of original and final jurisdiction—at once the *primary and dernier resort;* and who would dream of calling these *political* powers, and who could suppose that the exercise of them could be controlled by a co-ordinate branch of the government by asserting, suspending or supervising the result?

Coming to the powers of Congress enumerated in the second article of the Constitution, they are the prominent powers of a legislative character intrusted to be subjected to the veto of the executive or his approval. They, too, may be called exclusive. Among them, the power to declare war and grant letters of marque may be considered an exclusive political power. In another sense all legislation may be regarded as political. It is in this, that if it do not conflict with the Constitution, its policy or expediency is intangible by the judiciary; for in that case, however wild or ruinous it may be, the courts are bound implicitly to observe and enforce it. When both houses of Congress act apart from

Devoe v. Stewart, 32 T., 712; Bellew v. Casey, 60 T., 573; Jones v. Brazile, 1 App. C., sec. 299; Stubbs v. City of Galveston, 3 App. C., sec. 143; Kocher v. Mayberry, 15 T. C. A., 342. If the contract is only partly performed, recovery may be had on quantum meruit. Gonzales College v. McHugh, 21 T., 256; Carroll v. Welch, 26 T., 147; Hollis v. Chapman, 36 T., 1; Weis v. Devlin, 67 T., 507; Childress v. Smith, 90 T., 610; Sulzbacher v. Wilkinson, 1 App. C., sec. 994. Contract void under statute of frauds is basis for quantum meruit. Capers v. Stewart, 3 App. C., sec. 291.

the President, as an elective college, this is in the exertion of an exclusive constitutional power and there is nothing strictly political in the power or action.   But, for example, should Congress, with or without the executive sanction, pass a revenue law taxing one section of the Republic by express provision upon a higher ratio than another; or should prescribe paper money as a tender; should require a soldiery to be quartered upon the citizens at the will of military commanders to consume their substance without remuneration, could not the judiciary interpose?   I can not here do more than notice the powers of the legislative branch, and observe that by perusing the second article and glancing over the Constitution, it will be seen how very vast are those powers and how greatly they exceed those intrusted to the other branches; and when we remember that upon all matters of policy and expediency, that branch by a vote of two-thirds over the veto may be supreme, the judiciary being bound to observe and execute the legislative will, we are astounded at the contemplation, and find relief in the reflection that the people by a change of representation can remove abuses.   And yet though the proportions of the powers are thus unequal, I decided at Gonzales, and continue to believe, that the scope of legislative power is still more extended.   I may repeat a portion of my own opinion:

"This is a national government; and at the outset it is very important to ascertain to what degree it is limited, and to distinguish it from a federative government over independent states.   To the extents, in the modes, and upon the subjects on which the Constitution speaks, it is imperious, supreme, and paramount.   Thus the powers imparted to one branch are not to be exerted or usurped by another branch.   The duties devolved on Congress must be performed; the restrictions upon legislation that are expressed can not be transcended, and any act, whether elective or legislative, done or passed by that body that is in conflict with any direction, prohibition or barrier interposed by that instrument, is either void or voidable according to its nature, or in the view of the necessary conservative principles that must be invoked in testing or applying it.   The executive and judiciary must move alike within the orbits assigned them.   Thus far it is not only safe but demonstrable, that the charter of liberty must be ever followed.   But here the parallel between it and the Constitution of the United States ceases. That creates a government of conceded and limited powers; it vests in a national government not all, but only a portion of sovereignty or the general powers that pertain to government; whilst the residue of sovereignty is reserved equally to the States and the people, by whom the

---

Note 24.—Hall v. Allcorn, p. 433.

Retrospective laws prohibited by Constitution are such as give rights, or impair vested rights, by relation back.   Sutherland v. De Leon, 1 T., 250; De Cordova v. Galveston, 4 T., 470; Paschal v. Perez, 7 T., 348; Hamilton v. Flinn, 21 T., 713; Sherwood v. Fleming, 25 T. Supp., 408; Bender v. Crawford, 33 T., 745; Moore v. Letchford, 35 T., 185; Chalk v. Darden, 47 T., 438; White v. Martin, 66 T., 340; Mellinger v. Houston, 68 T., 37; Maynard v. Freeman (T. C. A.), U. R. C., 1900; Calder v. Bull, 3 Dal., 386; Cummings v. Mo., 4 Wall., 277; Campbell v. Holt, 115 U. S., 630.   Providing a remedy

Constitution itself was formed. But the government which our Constitution creates is, to all extents, in every degree, and for all purposes, a national and not federative government. The powers and rights not enumerated and declared are reserved to the people; and the only sensible, practicable and appreciable import of the reservation must be, that in regard to such powers and rights they are to be exerted by the people, *either in convention or through their senators and representatives in Congress;* and until their will, in reference to any matter or ground not occupied by the Constitution, shall be uttered in convention, it *can be expressed in legislation.* Let no one be alarmed at this proposition. If the fundamental law be overleaped, undermined, or even rudely approached, the Legislature will be held in check by the judiciary; or if hurtful or onerous measures or institutions be enacted, the people by a change of representatives can have them removed." I might have added, for certainty to every intent, that the reserved rights of the people can never be exerted in mobs, in Jacobin clubs, in local associations; and that nullification in Texas can only be revolt against the Constitution and government.

The conjunctive, exclusive powers vested in the President and senate to make treaties and to appoint ministers abroad and certain officers at home, you may call *political,* if you choose, on the maxim of the remarkable man, who asserted constantly with a solemn asseveration, *"there is policy in everything!"* Here, too, no one could pretend any controlling, restraining or revising power of the judiciary to arrest or suspend the action of the President and senate or to abrogate a treaty. But if a conflict between a treaty and a constitutional, vested, absolute right of a citizen should be properly brought before the proper court; or should the quo warranto be resorted to, to divest the franchise of an officer unconstitutionally obtruded on the country by the exertion of the appointive power, can it be supposed that the court could not or would not interfere, on the flimsy pretext that the President and senate had exerted a political power? It could and would interfere, not on a principle of paramount authority, but on the transcending principle that the judiciary is the guardian of the Constitution in the last resort.

It is not in any respect necessary to mention specially the powers of the executive that are constitutionally exclusive. In Foster and Elam v. Nulson, 2 Peters, 253, the controversy arose on the treaty of San Ildefonso, of October 1, 1800, by which Spain ceded Louisiana to France, and the treaty of Paris of April 30, 1803, ceding it to the United States. The United States, under these, claimed the country between the Iberville and Perdido. Spain repelled the claim. Foster and Elam

---

for existing rights, or changing remedy, is not a retrospective law prohibited. De Cordova v. Galveston, 4 T., 470; Paschal v. Perez, 7 T., 348; Treasurer v. Wygall, 46 T., 147; Worsham v. Stevens, 66 T., 89; Parker v. Buckner, 67 T., 20; Odom v. Garner, 86 T., 374; Association v. Newman, 86 T., 380; Fristoe v. Blum, 92 T., 76; Standifer v. Wilson, 93 T., 232; Capps v. Garvey (T. C. A.), U. R. C., 1897; Maynard v. Freeman (T. C. A.), U. R. C., 1900. Statutes are never construed to operate retrospectively unless their plain language requires it. Taylor v. Duncan, Dal., 514; Linn v. Scott, 3 T., 67;

claimed land in the disputed country under a grant from Spain between the dates of those treaties, relying on the sovereignty of Spain and her interpretation of the treaty of San Ildefonso; thus virtually calling on the court to settle a contested boundary between nations. Consequently, the court held that, "In a controversy between two nations concerning national boundary, it is scarcely possible that the courts of either should refuse to abide by the measures adopted by its own government."

"There being *no common tribunal to decide between them,* each determines for itself its own rights, and if they can not adjust their differences peaceably, the right remains with the strongest. The judiciary is not that department of the government to which the assertion of its interests as against foreign powers is confided; and its duty *commonly* is to decide upon individual rights, according to those principles which the political departments of the nation have established." It was further held, "that a treaty is in its nature a contract between two nations and not a legislative act. In other nations it is carried into operation by the sovereign; but in the United States it is made a law of the land. When its performance by either party is to be coerced, the political power of each State is invoked; but the courts compel obedience on the part of the citizens of the United States, as to a legislative act, after the political power has adopted it." All the principles recognized in this authority are sufficiently satisfactory.

It is not for the courts to settle boundaries between independent nations, nor to make treaties; but if the treaty be consummated and become the law of the land, it will be observed and enforced by the courts as another law. And why not? Do not the admiralty courts enforce the laws of nations as well as treaties, which are special international laws? Is, however, the treaty-making power the same as the legislative power of dividing the country into counties and districts, according to the limitations of the Constitution, for internal police and municipal administration? The latter is only an ordinary case of legislation, and like every other act of that sort, it must comport with the Constitution, else it is nothing. To the treaty-making power may be referred together the arguments alluding to the acquisition of Louisiana by the United States; the admission of Michigan into the North American Union; the extreme cases put by the learned counsel in argument from those political events; and all the instances from every treaty in ancient and modern times.

I intended a review of the important decisions of the Supreme Court of the United States cited in the argument; but this opinion is already

Martin v. State, 24 T., 61; Orr v. Rhine, 45 T., 345; Insurance Co. v. Ray, 50 T., 511; Grigsby v. Peak, 57 T., 142; Johnson v. Taylor, 60 T., 360; Mellinger v. Houston, 68 T., 37; Rockwall County v. Kaufman County, 69 T., 172; McGregor v. Goldammer, 2 U. C., 49; Murray v. Gibson, 15 How., 421; Harvey v. Tyler, 2 Wall., 329; Chewheong v. United States, 112 U. S., 536; Shreveport v. Cole, 129 U. S., 36.

too much extended, nor is it in the least degree necessary. Craig v. Missouri, 4 Pet., 410; Worcester v. Georgia, 6 Pet., 515; Rhode Island v. Massachusetts, 12 Pet., 627; Calder v. Bull, 3 Dal., 386; Marbury v. Madison, 1 Cran., 137; Providence Bank v. Billings, 4 Pet., 514; Martin v. Hunter, 1 Wheat., 304; Terrett v. Taylor, 9 Cran., 43; Briscoe v. Bank of Commonwealth of Kentucky, and many other cases that might be consulted, will show with what tenacity and firmness the Supreme Court of the United States has illustrated, vindicated and enforced its own great and essential conservative power of testing the acts of the federative Congress and those of the several States by the principles, the limitations, and standards fixed by the national Constitution. In the last case, Rhode Island v. Massachusetts, it went perhaps further than in any of those that preceded to disregard the position assumed that it was called upon to exert political power in establishing a line between those States; for it was held that controversies between the States were referred by the national compact contained in the Constitution to its decision.

I will not refer specifically to the case in which, in a vague and improvident expression, a definition was essayed of judicial as contradistinguished from political power; nor to that, some fourteen years afterward, declaring that the court had during the interim been departing step by step from the definition, and that it might be regarded as overruled. Indeed, in conclusion, it appears manifest to me, that the act of our Congress creating the territory of Ward, passed by both houses and sanctioned by the former President, is simply a common legislative act; that its validity comes in question before us more directly than any other statutory provision invoked as a criterion of right or rule of decision; and that if under any name or pretext it can be shown that we have no authority to review it in reference to its conformity or conflict with the Constitution, it follows irresistibly that we have not any authority whatever to declare any conceivable act of the Legislature unconstitutional and void. Texas is not yet prepared for such an abandonment of a high trust reposed, though it be vested in the last, the feeblest, and the most dependent branch of the government. Nor will it be yielded whilst the shadow of the name of civil liberty can be discerned. If the effect of the decision of this case should be to repudiate, as unconstitutional, the county of Ward, I am prepared to say, from a principle of necessity, consonant with sound practical sense and distributive justice, however variant from an exquisite chain of sophistries that might be elaborated, that all the judicial and ministerial action, had in

---

**Note 25.**—Austin v. White & Co., p. 434.

The Legislature may regulate the remedy, both as to pre-existing and subsequent rights, as to them may seem proper; and a statute changing or modifying it is not unconstitutional and does not impair obligation of contracts, unless it fails to provide an adequate remedy. Austin v. Andrews, Dal., 447; Selkirk v. Betts, Dal., 471; Catlin v. Munger, 1 T., 598; Gautier v. Franklin, 1 T., 732; De Cordova v. Galveston, 4 T., 470; Paschal v. Perez, 7 T., 348; Grassmeyer v. Beeson, 13 T., 524, 529; Bender v. Crawford, 33 T., 745, 752; Moore v. Letchford, 35 T., 185, 214; Bentinck v. Franklin, 38 T., 458;

the territory under the seeming sanction of the Constitution and the forms of law, is precisely as valid de facto as if it could have received and had actually received full and separate representation in Congress.

On both grounds, in my opinion, the judgment below ought to be affirmed.

*Affirmed.*

## No. XVII.

### FORBES, BROOKS & CO. v. WILLIAM G. HILL.

#### (See Note 41.)

*Appeal from Brazoria County.*

MORRIS, JUSTICE.—An execution in favor of Forbes, Brooks & Co. for $839.50 was levied on certain slaves of Hill, who obtained an injunction thereto, alleging that he had "pointed out property" to the sheriff to make levy on; but that the sheriff, with the advice of the plaintiffs in execution, or some one of them, and with the intention of harassing and oppressing the said Hill, failed to levy on the property so designated and proceeded to levy on his slaves.

The answer of Brooks, one of the defendants in the injunction and a partner in the firm of Forbes, Brooks & Co., denies that he gave any instructions to the sheriff, except to levy on property to which Hill had a title, and that he does not believe any other instructions were given by the other partners, one whom has never resided in the Republic, nor had any management of the partnership affairs; and that the other partner is now absent from the country. The sheriff denies all oppressive action or intention on his part in the levy of the execution, and for further answer denies that Hill ever designated or offered to designate any lands belonging to himself to be levied on. The cause came on to be tried at the March term of the District Court for the county of Brazoria, and was submitted to the court; the injunction perpetuated; but "liberty granted (to use the words of the court) to the plaintiff in execution to sue out another execution, having due regard to the grounds upon which this injunction is perpetuated." An appeal is taken to this court.

The fifth section of an act of the Fourth Congress, concerning executions, prescribes: "That all executions shall be made returnable to the next term of the court, and the defendant or his agent in all cases shall have the right to designate the property; and if the defendant shall fail or refuse to designate the same, then the levy shall be made on personal

---

Wood v. Welder, 42 T., 396; Treasurer v. Wygall, 46 T., 447; McLane v. Paschal, 62 T., 102; Ward v. Hubbard, 62 T., 559; Collins v. Warren, 63 T., 311; Parker v. Buckner, 67 T., 20; Boone v. Chambers, 82 T., 480; Odum v. Garner, 86 T., 374; B. and L. Assn. v. Newman, 86 T., 380; Standifer v. Wilson, 93 T., 232; League v. State, 93 T., 553; State v. Williams, 10 T. C. A., 346; Insurance Co. v. Shearman, 17 T. C. A., 456; T. M. Ry. Co. v. Telegraph Co., 24 T. C. A., 198; Etter v. M. P. Ry. Co., 2 App. C., sec. 61; Moore v. State, 20 T. App., 280; Maynard v. Freeman (T. C. A.), U. R. C., 1900; Williams v. Bradley (T. C. A.), U. R. C., 1902. Where a statute gives a new remedy,

or movable property first; then on uncultivated lands; then on slaves," etc. Under this section it is contended that it is not necessary for the defendant to point out *his own property,* and that the sheriff is bound to make the levy on *"property designated,"* whether the defendant have title or not; he (the sheriff) not being the proper person to inquire into the title of the defendant to property thus designated.

We can not believe that a statute should be construed so as to lead to the flagrant and palpable absurdity that an individual can point out the property of another to satisfy a debt of his own. Such a construction would be at war with the plainest dictates of common sense, as well as the usual and legal construction of statutes. True, the exercise of the discretion on the part of the sheriff, of refusing to *levy* on property pointed out by the defendant and to which he asserted a title, might in some instances be used for the purposes of oppression; but there the doors of the courts are always open to restrain, upon proper allegations, such illegal and inequitable proceedings; but in this instance the plaintiff in this bill does not even allege title to property pointed out, and the error originally existing in the granting of the injunction is rendered more glaring in its perpetuation. With regard to the suggestion of counsel that the injunction being perpetuated only as to the particular execution, leave being granted to the plaintiffs in execution to sue out another, no right of the said plaintiff was impaired and no cause existed for appeal, we can only say that the judgment of the court below was final, and the course to be pursued by the party who considered himself aggrieved by that judgment was not liable to the dictation of the court; but a matter of right on which he could exercise his own discretion, and pursue the remedy which the law afforded him by appeal to a higher tribunal. We are therefore of opinion that the judgment of the court below be totally reversed.

*Reversed.*

Chief Justice Hemphill and Judge John T. Mills concur. Judges A. Hutchinson and R. E. B. Baylor say: "We concur in the above opinion, but feel it proper to go further and say that this was not a case for injunction. Each court of original jurisdiction has the necessary control over its final process and the action of its ministerial officer; but this is executed not by injunction but supersedeas, which brings back the process if irregular, or arrests the action of the officer if illegal or oppressive. Here there is no complaint against the judgment for injustice; and wherefore an injunction? The whole case is radically and throughout wrong."

not repugnant nor inconsistent with the old remedy, the latter is not taken away, and parties have their election between the two. Thouvenin v. Rodrigues, 24 T., 468; Etter v. M. P. Ry. Co., 2 App. C., sec. 58; M. P. Ry. Co. v. Parkhurst, 3 App. C., sec. 159. Injunction does not lie to prevent excessive levy. Citizens Nat. Bank v. Interior Land and Im. Co., 14 T. C. A., 301; G. C. & S. F. Ry. Co. v. Holt, 1 App. C., sec. 839.

**Note 26.**—Hall v. Phelps, p. 435.

On dissolution of injunction, plaintiff is entitled to have petition con-

## No. XVIII.

### A. M. TOMPKINS v. THE REPUBLIC.

*Appeal from Harris County.*

HUTCHINSON, JUSTICE.—The appellant was indicted for gaming. In one plea he presented seven matters of fact; impeaching the panel of the jurors, out of whom the grand jury was formed; the venire facias; the mode and materials of the grand inquest, and the competency of one of that body; and an eighth point, in substance a demurrer to the indictment. There was evidence on the matters of fact pleaded—a verdict of guilty—a judgment thereon; and all the questions arising on the plea reserved by the court, as novel and difficult, for decision here.

For brevity, the points will be considered more in the order as presented by the statutes than as disclosed by the record—a practical exposition of the statutes on the subject being desired.

By the thirty-first section of the act organizing the district courts, the first panel and venire facias were obtained. The first or second judge, or alcalde then in commission, was to make and deposit with the clerk of the district and of the county court a list of all the freeholders or householders in the county. The names were to be separated and put in a box to be kept for the purpose; and the first panel was to be drawn by the clerk and sheriff before such judge or alcalde. That section gave the permanent number and some of the qualifications of the jurors, the venire facias, the execution of it, and the penalty on defaulting jurors. By the thirty-second section, at the first term of the district court and ever afterward the clerk and sheriff, in open court, were directed to draw out of the box mentioned a panel for the coming term; and if from any cause it should be omitted, the panel was to be drawn by the clerk and sheriff before a justice of the peace; and in either case, if the person or persons drawn should have removed, the drawing was to be continued until the number thirty-six should be obtained. "And the names of the jurors drawn shall be put into a separate box, to be kept separate until all are drawn." The forty-first section of the act prescribes other qualifications of a juror; but obviously by accident omitted the word "householder." According to the thirty-third section the court, "from the whole number of jurors furnished as aforesaid and attending," should cause a grand jury to be elected as therein prescribed. By the thirty-fifth section, any deficit was allowed to be supplied, by order of the court, from the bystanders.

We are left at conjecture why it was that the judge or alcalde was

---

tinued over for final trial on merits. Horton v. Jones, Dal., 466; Hanchett v. Gray, 7 T., 549; Fulgham v. Chevallier, 10 T., 518; Lander v. State, 12 T., 462; Burnley v. Cook, 13 T., 586; Eccles v. Daniels, 16 T., 136; Sims v. Redding, 20 T., 386; Dangerfield v. Paschal, 20 T., 536; Edrington v. Allsbrooks, 21 T., 186; Dearborn v. Phillips, 21 T., 449; Floyd v. Turner, 23 T., 292; Baldridge v. Cook, 27 T., 565; Grant v. Chambers, 34 T., 573; Aiken v. Carroll, 37 T., 73; Hewett v. Thomas, 37 T., 520; Pullen v. Baker, 41 T., 419; Kelley v.

required, in the first instance, to return to the clerk of the county court a list of the jurors. Let this pass away. It is evident the Legislature intended that the persons—all the persons in each county—who should be freeholders or householders, if otherwise qualified and not specially exempted, should perform jury service. The persons designated to draw the first and all subsequent panels are plainly the clerk of the district court and sheriff. The judicial superintendent is the district judge, in open court; or in a case of pretermission, a justice of the peace. The great object being to subject all of the citizens to the chances of the allotment by drawing, and as judicial superintendence is appointed, and moreover as at each drawing those not residing in the county were to be excluded, it is not unsafe or too assumptive to say that the persons not in the original list, but equally liable to jury service, should be added, and that their names should pass through the first and second urns. In the view of these statutory provisions and of the correlative laws, we deduce these principles as rules of practice:

1. All free male citizens, who are freeholders or householders of the county, should be put on a list to be kept by the clerk of the district court as an archive. It ought to be an alphabetical list in a bound book, in order to be permanent. At each term or drawing those not listed, but having become subject to jury service, ought to be put on the list, and their names deposited in the first box.

2. It is an important duty, and one not to be omitted, that at each term the district court should cause the two boxes or urns and the jury list to be brought into court, and a panel for the coming term drawn; the additional names being first added to the list and deposited in the first urn. On drawing the first name the judge, clerk and sheriff will determine, preliminarily, if he be a citizen and a freeholder or householder. If rejected, the cause of rejection will be noted on the list and the billet cast aside. If received, the name will be entered on the panel, and the billet containing it passed into the second urn. Thus the full panel should be formed. This reception or recognition of the person will not be conclusive of his qualifications as a juror. If he be under or over age, or be specially exempted, he can urge his privilege in court when summoned and attending. If he be a convict, then according to the forty-first section it will be an exception to him on a challenge to the polls, or on the plea of some one prosecuted. As the drawing is an act of the court, the panel ought to be entered on the minutes.

3. If, however, the panel shall not be drawn in court, then it can

Whitmore, 41 T., 647; McKay v. State, 44 T., 43; Gaskins v. Peebles, 44 T., 390; Bridges v. Cundiff, 45 T., 437; Watt v. White, 46 T., 338; Snow v. Nash, 50 T., 216; Texas Land Co. v. Turman, 53 T., 619; Hale v. McComas, 59 T., 484; Washington County v. Schulz, 63 T., 32; Love v. Powell, 67 T., 15; Daugherty v. Gibbs, 2 U. C., 255; Wagner v. Edmiston, 1 App. C., sec. 678.

**Note 27.**—McKinney & Williams v. Bradbury, Administrator, p. 441.

The allegata and probata must correspond, and any material variance between them is fatal. The evidence must be confined to the issues made by the pleadings. Mims v. Mitchell, 1 T., 443; McClelland v. Smith, 3 T., 210; Hall v. Jones, 3 T., 305; Guess v. Lubbock, 5 T., 535; Roseborough v. Gorman,

be drawn by the clerk and sheriff before a justice of the peace in the same manner in every respect, and the panel entered on the minute book.

4.  When the names in the first urn are exhausted, those in the second should be transferred to the first urn, and thus the process is perpetuated; the list, the billets, and the urns successively reformed and replenished, and the regular rotation of jury service continued.

5.  The venire facias is a writ containing the panel and commanding the sheriff to summon the jurors designated. He ought to make a specific return of the names of those notified.

6.  If from the number thus summoned and attending there be not enough to form a grand jury, the court can order the sheriff to summon a number of the bystanders that may be sufficient.

7.  To prevent exceptions and pleas the court ought to interrogate the jurors, before they are sworn on the grand inquest, as to the qualifications of citizenship and being freeholders or householders.

8.  If any one or more of the grand jury be incompetent on account of alienage, or being no resident freeholder or householder, it is a valid challenge to the polls at the formation of the inquest, or a good plea by a defendant against whom the grand jury found a bill.

9.  A defendant, prosecuted criminally, is not bound to except or plead to the array or the polls until after he is arrested; and to prohibit objections of that sort subsequent to the election of the grand inquest would be to allow innovations and violations of the laws that would too soon subvert the institution itself.

10.  Without passing on each of the points raised and the proof in the case, with a view to ascertain how many of the preceding principles have been violated, it may suffice to say that as one of the grand jury was not a freeholder or householder, the finding of the indictment was invalid.

11.  We think the indictment substantial. Let the judgment be reversed.

*Reversed.*

Chief Justice John Hemphill and Judges R. E. B. Baylor and P. C. Jack concur. Judge Judge John T. Mills says: "I am satisfied the judgment should be reversed, and will deliver my opinion at a future day."

6 T., 313; Paul v. Perez, 7 T., 338; Horton v. Reynolds, 8 T., 284; Young v. Lewis, 9 T., 73; McGreal v. Wilson, 9 T., 426; Parker v. Leman, 10 T., 116; Smith v. Montes, 11 T., 24; Thompson v. Thompson, 12 T., 327; Gammage v. Alexander, 14 T., 414; Chrisman v. Miller, 15 T., 159; Rogers v. Bracken, 15 T., 564; Dickson v. League, 16 T., 400; Kottwitz v. Bagby, 16 T., 656; Brown v. Martin, 19 T., 343; Parker v. Beavers, 19 T., 406; Lemmon v. Hanley, 28 T., 219; Heilbroner v. Hancock, 33 T., 714; Adams v. Hicks, 41 T., 239; Shipman v. Fulcrod, 42 T., 248; Dean v. Lyons, 47 T., 18; Tarleton v. Dailey, 55 T., 92; Loving v. Dixon, 56 T., 75; Laredo v. Russell, 56 T., 398; Ballew v. Casey, 60 T., 573; Wallace v. Boyce, 62 T., 636; Stewart v. Gordon, 65 T., 344; Middlebrook v. Zapp, 73 T., 29; Cooper v. Laughlin, 75 T., 524; Shiner v. Abbey, 77 T., 1; Morris v. Keisling, 79 T., 141; Moore v. Kennedy, 81 T., 144; Tinsley v. Penniman, 83 T., 54; Cooper v. Conerty, 83 T., 133; Armstrong v. O'Brien, 83 T., 635; Hoffman v. Loan Assn., 85 T., 409; Telegraph Co. v.

## No. XIX.

## L. W. TINNEN v. E. MATTHEWS.

(See Note 42.)

*Appeal from Harris County.*

HEMPHILL, CHIEF JUSTICE.—The action was brought in this case on a note of hand drawn by the appellant in favor of James Weatherford, and by a second indorsement transferred to the appellee. On the first day of the term of the court to which the writ was returnable, the defendant in the court below craved oyer of the note on which the suit was instituted, and the defendant thereof prayed judgment for costs. On the fifth day of the term the entry states that the demurrer of the defendant was overruled and the issue joined submitted to a jury, who returned a verdict for plaintiff for $318. Judgment was entered for not only the amount of said verdict, but for the additional sum of $85.54 as damages for the detention of the debt. A motion was made for a new trial on the ground that the cause was submitted to the jury without answer on the part of the defendant putting in issue any fact whatsoever; that a judgment in default should have been rendered against him; that by law he would have been entitled to a term of three days thereafter to plead any matters in his defense; and that he has a legal and valid defense to the action. The motion for a new trial was overruled, and an appeal has been taken to this court. From the entries in this cause it would seem, that the craving of oyer on the part of the defendant was regarded as a demurrer to the plaintiff's petition. This is doubtless a misentry of the clerk. The distinction between the demand of oyer and the plea in law styled demurrer is so palpable that the possibility of their being confounded by a judicial tribunal can not well be supposed. It will be unnecessary to discuss at length the frivolous distinction by which in the courts, governed purely by the common law, oyer is granted of sealed and is refused of unsealed instruments.

This was an arbitrary difference founded on no solid grounds, and in England at the present time is evaded and rendered nugatory. In that country the judges will in most cases at the demand of the opposite party order the inspection and a copy of unsealed instruments. It may well be doubted whether such a distinction can properly exist under the system of pleading authorized by the laws of this country. The right of oyer under the common law, is founded on the necessity imposed on the opposite party when relying on a deed, bond, etc., as the foundation of the

Smith, 88 T., 9; Robinson v. Moore, 1 T. C. A., 93; G. C. & S. F. Ry. Co. v. Vieno, 7 T. C. A., 347; Quithana v. Smelting Co., 14 T. C. A., 347; G. H. & S. A. Ry. Co. v. Scott, 18 T. C. A., 321; Burnett v. Edling, 19 T. C. A., 711; Masterson v. Bockel, 20 T. C. A., 416; Dutton v. Mason, 21 T. C. A., 389; F. W. & D. C. Ry. Co. v. Rogers, 21 T. C. A., 605; Standart v. Vivion, 22 T. C. A., 144; Cranfil v. Hayden, 22 T. C. A., 656; Jones v. Drug Co., 25 T. C. A., 234; Jones v. Brazile, 1 App. C., sec. 299; Rogers v. Harrison, 1 App. C.,

cause of action, or as a ground of defense, to make profert of the deed, bond, etc. No profert is made of a promissory note, and therefore the right of oyer did not arise. These are technical distinctions of the system of pleading under the common law. Under the simplicity of the system adopted by the statutes of this Republic they must surely be unknown. Our statute prescribing the essential allegation of a petition makes no discrimination between petition on a bond and one on a note. It certainly does not contemplate that profert should be made in the one case and not in the other; and as the basis on which the rights of oyer, technically so called, is swept away, it would seem absurd that this obnoxious distinction should continue to exist. We are, however, of opinion that in all cases where the action or defense is founded on a written instrument, whether sealed or unsealed, the opposite party is on motion before issue joined entitled to inspection of the same, and that the judge below erred in not granting the prayer of the defendant for oyer of the instrument sued on.

The record shows that judgment was entered upon the fifth day of the term. This, we are of opinion, was error. There being no answer, judgment by default should have been taken on the second day of the term; and if in three days thereafter the defendant neither appeared nor filed his answer, definitive judgment should have been given for plaintiff.

The proper construction of the third and fourth sections of the "act regulating civil suits," approved February 5, 1840, does not seem to authorize the renditions of definitive judgment where the defendant does not appear and answer before the sixth day of the term of the court; and consequently the judgment in this cause was premature and in violation of the rights of the defendant.

Another error apparent on the face of the record was alluded to in the argument and brief of counsel. The verdict of the jury is for the sum of $318. Judgment is entered thereon for that amount, and for the additional sum of $85.54 as damages for the detention of the debt. This was unauthorized, as there is no principle of law more firmly established than that the judgment must correspond with the verdict.

It is ordered, adjudged and decreed that the judgment of the court below be and the same is hereby reversed, and that the cause be remanded for a new trial.

*Reversed and remanded.*

sec. 495; McArnis v. McIntyre, 1 App. C., sec. 514; Smith v. McGehee, 1 App. C., sec. 940; Winn v. Sloan, 1 App. C., sec. 1107; Walker v. Simkins, 2 App. C., sec. 70; T. & P. Ry. Co. v. Wheat, 2 App. C., sec. 166; T. & N. O. Ry. Co. v. Oates, 2 App. C., sec. 618; G. C. & S. F. Ry. Co. v. Witt, 2 App. C., sec. 774; M. P. Ry. Co. v. Teague, 2 App. C., sec. 780; Henry v. Fay, 2 App. C., sec. 834; Ross v. Hawley, 3 App. C., sec. 107; Land Co. v. Jones, 3 App., sec. 271; McDannell v. Horrell, 1 U. C., 524.

**Note 28.**—Austin v. Andrews, Administrator, p. 447.

The Legislature may regulate the remedy, both as to pre-existing and subsequent rights, as to them may seem proper; and a statute changing or modifying it is not unconstitutional and does not impair obligation of contracts, unless it fails to provide an adequate remedy. Austin v. White, Dal., 434; Selkirk v. Betts, Dal., 471; Catlin v. Munger, 1 T., 598; Gautier v.

# JUNE TERM, 1843.

## No. I.

### BARTHOLOMEW MANLOVE v. THOMAS KINNEY.
#### (See Note 43.)

*Appeal from Bastrop.*

HEMPHILL, CHIEF JUSTICE.—In this case no notice of appeal was given in the court below, nor was any bond filed.

There is then no foundation for the exercise of the jurisdiction of this tribunal, and the case is accordingly ordered to be removed from the docket.

## No. II.

### WM. H. McGILL AND WIFE v. A. C. DELAPLAIN,
### ADMINISTRATOR, ETC.

#### (See Note 44.)

*Appeal from Bastrop.*

BAYLOR, JUSTICE.—Rebecca Pincena while a feme sole filed her petition in the probate court for Bastrop County, alleging that A. C. Delaplain, administrator of William Brisbone, deceased, was indebted to her in the sum of $738.16, for and on account of work and labor performed by her for the said William Brisbone, deceased, in his lifetime, at his special instance and request, and for money had and received by him to her use, and so forth.

Upon an investigation of the matter in the probate court, she recovered a judgment and decree for the sum of $441.30 against Delaplain, administrator, as aforesaid. From which judgment and decree the said Delaplain appealed to the District Court for Bastrop County.

On the trial of the case there, the said Rebecca Pincena, who had then intermarried with Wm. H. McGill, proved by Andrew Mays, a witness, that there was a balance due the plaintiff for work and labor done and performed by the said Rebecca for the said Brisbone in his lifetime. They also produced in evidence an account, stated to be found among the papers of William Brisbone, deceased, containing a statement of moneys received by him as guardian for the said Rebecca upon an attempted settlement in the State of Mississippi, from whence the said Brisbone, deceased, removed to Texas, bringing with him the said Rebecca, who was

Franklin, 1 T., 732; De Cordova v. Galveston, 4 T., 470; Paschal v. Perez, 7 T., 348; Grassmeyer v. Beeson, 13 T., 524, 529; Bender v. Crawford, 33 T., 745, 752; Moore v. Letchford, 35 T., 185, 214; Bentinck v. Franklin, 38 T.,

then a minor. The foregoing evidence being submitted to the jury, the defendant by his counsel moved the court to nonsuit the plaintiff and dismiss the case; which motion was sustained by the court below, and judgment rendered accordingly against McGill and wife; to reverse which they prayed an appeal to this court, and object here, that after the introduction of testimony showing a strong presumption in favor of the plaintiff's right to recover, it was not competent for the judge below to take the case from the jury and dismiss the petition or nonsuit the plaintiff on the ground of insufficiency of proof, etc.

We think the objection well taken. At a former term of this court, in the case of Guest v. Guest, we decided that the district court had no power to compel the party to take a nonsuit; we see no good reason to depart from this decision.

It has been argued by the counsel for the appellee that at the time the judgment of the court below was rendered, the civil law prevailed, and by that law, the judge below had the power to nonsuit the plaintiff. It is true where the civil laws prevails, there are cases to be found' to that effect. But by our Constitution and laws we think the trial by jury was secured to the plaintiffs if they chose to persist in it. The judgment and decree of the court below must therefore· be set aside, annulled and reversed, and a new trial awarded in the court below.

*Reversed and remanded.*

## No. III.

### ALLCORN, ADMINISTRATOR, ETC., V. SWEENY.

(See Note 45.)

*Appeal from Brazoria.*

MORRIS, JUSTICE.—Allcorn, as administrator of one Caples, deceased, sues Sweeny on a promissory note for $3460.50. Sweeny in his answer admits the execution of the note, but alleges that it was in consideration of the sale of a tract of land by Caples in his lifetime to him, Sweeny. That a bond was executed by Caples to him conditioned to make a title to him in three months from the 10th day of March, A. D. 1837, under the penalty of $30,000 in case of failure therein. That Caples fraudulently represented himself to be the owner of said land, when in fact one-eighth of said land was claimed by one John W. Cloud; that he frequently demanded title from said Caples during his lifetime, and from his administrator, Allcorn, since his death, which they failed and neglected to make. That he is fearful he will be disquieted in the possession of all the land. He therefore pleads in reconvention and claims

458; Wood v. Welder, 42 T., 396; Treasurer v. Wygall, 46 T., 447; McLane v. Paschal, 62 T., 102; Ward v. Hubbard, 62 T., 559; Collins v. Warren, 63 T., 311; Parker v. Buckner, 67 T., 20; Boone v. Chambers, 82 T., 480; Odum v. Garner, 86 T., 374; B. and L. Assn. v. Newman, 86 T., 380; Standifer v. Wilson, 93 T., 232; League v. State, 93 T., 553; State v. Williams, 10 T. C. A., 346; Insurance Co. v. Shearman, 17 T. C. A., 456; T. M. Ry. Co. v. Telegraph

$30,000 penalty under the bond. The jury found a verdict for the defendant $14,000, for which amount judgment was rendered; on which judgment an appeal was taken to this court.

From the statement of facts we ascertain that a bond such as is described in the answer was executed by Caples. That Caples died previous to the expiration of the term of time mentioned in the bond. The value of the land was proven to be from three to five dollars per acre. It was also proven that in the fall, previous to the commencement of this suit, a company of men agreed to purchase 300 acres of this land from Sweeny for $6000, but that the contract was not consummated in consequence of Sweeny's inability to make them a satisfactory title.

The land was to be purchased in order to erect a town, and witness thought if the town had been erected, the value of the land adjacent would have been much enhanced. A deed executed by the administrator for four-fifths of the land was tendered Sweeny at the term of the court when the cause was tried, and refused by Sweeny. A letter on file in the records of the court, in a cause pending between Allcorn, administrator of Caples, as plaintiff, and John W. Cloud, from Cloud to Allcorn, was introduced to show that a demand had been made of the administrator. The judges charged the jury "that it was competent for the intestate to bind himself, his heirs, etc., in stipulated damages to make a title to the land, and that the death did not lessen the obligation and the necessity of complying with the terms of the obligation." A motion for a new trial was made and withdrawn, in order to a more speedy determination of the case in this court. The counsel in argument concede that the bond on which the plea in reconvention is based was an ordinary penal bond, and that the amount therein specified was not claimed as stipulated or liquidated damages, but only such damages were sought by the plaintiff in reconvention and found by the jury as were actually sustained; the measure whereof would be the value of the land as disclosed by the testimony. Several questions have been raised as to the necessity of a demand, the time for such demand, and of whom it would be made; which we do not deem it necessary to decide in this cause. We shall therefore proceed at once to that point which is decisive of the case in its present attitude. It appears that a contract of sale was made between Allcorn's intestate (Caples) and Sweeny, for certain lands, and the bond above mentioned given by Caples to Sweeny. Caples' administrator sued Sweeny for the purchase money, and Sweeny recovered in damages for the failure of Caples to perform the condition of his bond. Under the sale the possession of the land was delivered to Sweeny. The land was his, would de-

---

Co., 24 T. C. A., 198; Etter v. M. P. Ry. Co., 2 App. C., sec. 61; Moore v. State, 20 T. App., 280; Maynard v. Freeman (T. C. A.), U. R. C., 1900; Williams v. Bradley (T. C. A.), U. R. C., 1902. Where a statute gives a new remedy, not repugnant nor inconsistent with the old remedy, the latter is not taken away, and parties have their election between the two. Thouvenin v. Rodrigues, 24 T., 468; Etter v. M. P. Ry. Co., 2 App. C., sec. 58; M. P. Ry. Co. v. Parkhurst, 3 App. C., sec. 159.

**Note 29.**—Hirams & Donaho v. Coit, p. 449.

[1] Omission of obligor's name in body of bond is an immaterial defect.

scend to his heirs, and be devisable by his will. The powers and rights of the vendor, or those claiming under him, over and to the land, has passed forever to Sweeny. With Sweeny, however, under the condition of the bond, rested the election, in case of inability, failure or neglect on the part of the obligors in the bond, to make a good and sufficient title; either to enforce that title through the medium of the courts, or to rescind the contract and recover his damages. He elects to pursue the latter course, and refusing the deed for four-fifths of the land tendered him by the administrator, demands at the hands of a jury his entire damages. There is no plainer requisition of law, as well as reason and justice, than that where a party on such a contract as the bond under consideration seeks to exact a penalty for the nonperformance of a particular act, that all things must be restored, as nearly as may be, to their original position, before such penalty can be enforced. Has this been done by Sweeny, the plaintiff in reconvention? He admits himself to be in possession of the land; he refuses a title to four-fifths thereof; he shows no eviction, or attempt at eviction by the vendor, his heirs, or administrators; he shows no outstanding title in any other person; he makes no tender of the premises, but holds on to his possession and still claims and obtains, at the hands of the jury, full damages to the value of the land proven, and even consequential damages as to a part. This verdict then, under these circumstances, is at once illegal, exorbitant and oppressive, and can never be permitted to stand unreversed. It is therefore ordered that the judgment of the court below be reversed and the cause remanded for a new trial.

*Reversed and remanded.*

## No. IV.

### JESSE BENTON v. ELI WILLIAMS.

*Appeal from Harris County.*

JACK, JUSTICE.—Eli Williams sued Jesse Benton in the District Court of Harris County to recover damages for an assault and battery alleged to have been committed by Benton on Williams. The defendant filed two pleas by way of answer to the plaintiff's petition. First, justification; and secondly, that the defendant ought not to be held to answer the complaint of the plaintiff in this cause, because "Eli Williams is of African descent, and not entitled by law to maintain his action, except by

Cook v. Crawford, 1 T., 9; San Roman v. Watson, 54 T., 254; Baldridge v. Penland, 68 T., 441; Braidfoot v. Taylor, 1 App. C., sec. 175; Babbitt v. Finn, 101 U. S., 7; Weis v. Chipman, 3 T. C. A., 106. If the names are only recited in the body and not subscribed, the bond is void. Pevito v. Rodgers, 52 T., 581.

[2] Answers not responsive to interrogatories should be stricken out on objection. Rev. Stats. 1895, art. 2291. Lee v. Stowe, 57 T., 444; M. P. Ry. Co. v. Ivy, 71 T., 409; Parker v. Chancellor, 78 T., 524; Crosson v. Dwyer, 9 T. C. A., 482; Pioneer Savings and Loan Co. v. Peck, 20 T. C. A., 111.

his guardian or next friend." To this last plea the plaintiff demurred. The demurrer was sustained by the judge who tried the case below. The parties then went to trial on the other plea. There was a verdict and judgment for plaintiff, from which the defendant appealed. He now seeks to reverse the judgment of the district court on the ground of error in sustaining the plaintiff's demurrer to his plea.

This is the only question that we are required to decide. The case has been submitted to us without argument or brief, and we have been unable from the books in our reach to find any authority to sustain the principle of law as contended for in defendant's plea. The only grounds upon which we suppose the counsel for the defendant could have based an argument are to be found in the Constitution, in which is to be found the following: "The descendants of Africans shall not be permitted to remain permanently in the Republic without the consent of Congress;" nor are such persons entitled to the rights of citizenship. But we can not conclude that because they are not entitled to some particular privileges, they are, while actually residing in our country, out of the pale of the protection of the law, and that injuries and aggressions may be wantonly committed on their persons and property, and that when they ask for a redress of such grievances, they are to be told that the courts of justice are closed against their complaints. We can not, by sustaining the defendant's plea, establish a principle which we regard against law, contrary to the spirit of our institutions, and in violation of the dictates of common humanity. The judge below correctly sustained the demurrer to the defendant's plea. The judgment of the district court must be affirmed. We have declined giving an opinion on the appellee's motion to dismiss, because we thought the ends of justice would be as well obtained by a decision on the merits, which was also submitted.

*Affirmed.*

### No. V.

### JACOB GARRET v. JOHN D. NASH AND WIFE.

*Appeal from San Augustine.*

HEMPHILL, CHIEF JUSTICE.—Ellen A. Nash, being joined by her husband, instituted suit in the court of probate for the county of San Augustine against Jacob Garret, the appellant in this court, and others named in the petition, to recover the portion of the estate of her former husband, Claiborne Garret, deceased, to which by law she might be enti-

---

**Note 30.**—Whiting v. Turley, p. 453.

By the Act of February 5, 1840 (Gammel's Laws of Texas, vol. 2, p. 262), Rev. Stats. 1895, art. 1181, providing that proceedings in civil suits "shall be by petition and answer," and providing against adoption of common law system of pleading, was only intended to designate a system of pleading and not to prescribe rules. It should be strictly construed. Underwood v. Parrott, 2 T., 168. The pleader, under our system, is not confined to the common law counts. The rules of courts of law and chancery, found in elementary treatises on pleading, are not conclusive authority in our system. Caldwell

tled. When the case came up for trial in the district court, the facts. being agreed upon and submitted to the court, it was decided that the said Nash and wife were entitled to one-fourth of the estate of which the said Claiborne Garret died seized and possessed, after the payment of all just demands against said estate; provided the said fourth part of said estate did not exceed one hundred pounds of gold, or the value thereof. From this judgment an appeal was taken to this court. In the argument of counsel our attention has been directed almost entirely to that portion of the statement of facts in which the acknowledgment is made, that Claiborne Garret departed this life in the month of May, 1837, leaving the said Ellen A., his wife, destitute of any estate or property; and that the said Ellen A. intermarried with the said John D. Nash in the month of August following.

Our inquiries will then be reduced to the narrow compass of ascertaining whether, under the circumstances of the impoverishment of the widow, she was entitled to the fourth part of her deceased husband's estate, notwithstanding her remarriage within the period of twelve months after his death.

In Partida 6, Title 13, Law 7, it is declared, that men are sometimes content to marry women who are poor and without a dowry; it is therefore but just and proper that since they loved and honored them through life, they should not leave them destitute at their death. The ancient sages have therefore thought fit to ordain, that if the husband should not leave such wife the means of living independently, and she should not possess them herself, then she may inherit one-fourth of the estate, notwithstanding he should leave children; but such fourth part ought not to exceed one hundred pounds of gold, however great may be the estate of the deceased. It is unquestionable, then, that under the wise and beneficent provisions of this law, the destitute widow is entitled to the one-fourth of her deceased husband's estate, subject only to the limitation that it shall not exceed one hundred pounds of gold. But it is contended, that notwithstanding the salutary guarantees of this law securing the widow (who during the continuance of the matrimonial union has been surrounded by comforts) from indigence and want, yet she forfeits all its benefits by marrying a second time within the first twelve months of her widowhood, or even during the course of her life. To support the position assumed by the appellant, reference is made to the 3d Partida, title 11, Law 3, and to a passage in the works of Febrero. In the Partida it is said that the secular law prohibits the widow from marrying within one year after the death of her husband, and imposes a penalty, upon those who marry before that time, of infamy; and that she loses the arras

v. Haley, 3 T., 317; Mays v. Lewis, 4 T., 38; Holman v. Criswell, 15 T., 394; Payne v. Benham, 16 T., 364; Flores v. Maverick, 24 T., 526.

**Note 31.**—Hart v. King, p. 456.

Action of court in granting or refusing continuances will not be revised unless it is plain that injustice has been done. Ward v. Boon, Dal., 561; Hipp v. Bissell, 3 T., 18; Hipp v. Huchett, 4 T., 20; Ayers v. Duprey, 27 T., 593; Peck v. Moody, 33 T., 84; Addington v. Bryson, 1 App. C., sec. 1292; Texas Express Co. v. Scott, 2 App. C., sec. 72. Where the allowance or refusal of

and other donations made her by her deceased husband, and all other things which he had left her by will, etc. The passage from Febrero is presumed to be the following: Hay tres casos no obstante enque pueda perder este derecho; Primero, si la vinda vive dishonestamente; secgundo, si secasan; Tercero, si se que dan usufructuarios: Febrero, vol. 1, part 1, cap. 1. ["There are three cases in which she loses this right (the marital fourth). If she leads a disgraceful life; second, if they are married; third, if they are usufructuaries."] If the law as expressed in the Partidas, remained still of force, and the comment of Febrero were not explained with other portions of his own works, and also by other commentators, the conclusion that the judgment of the court below was erroneous would be inevitable. But on a careful examination of the limited number of books and authorities on the subject of Spanish laws and jurisprudence to which we have access, we are of opinion that the law is repealed, and the passage in Febrero contradicted, or perhaps explained more fully by himself and other commentators of established authority. The Recopilacions are not within the reach of this court; and we are compelled to decide upon the provisions of the laws of Spain, not from a personal examination, but upon the authority of text-writers and commentators. On application then to the only attainable sources of information, we find in the Institutes of the Civil Law of Spain by Aso and Manuel, that the above law embraced in the Code of Partidas, which prohibited widows from marrying within a year after the death of their husband, has been annulled, and the civil penalties incurred thereby abrogated. See 1 White's Recop., p. 47.

On the passage which has been cited from Febrero it has been strenuously urged that should a widow ever marry again after the death of her husband, the marital fourth to which otherwise she was entitled would be forfeited. But subsequent comments on the same author, sanctioned, enlarged and modified by other writers, authorize us to conclude, that under the laws in force at the accrual of the rights of appellee, where the widow married a second time, whether before or after the first year of her widowhood, she lost the legal title to but enjoyed the usufruct of the *marital fourth* during her life, and this only when the husband left children at the time of his death; for otherwise it became entirely her own.

In the first volume of Febrero, Nov., p. 425, the author says in substance that poor widows, the children by inheritance from the father being rich, are entitled to a fourth part of the husband's goods, provided the same does not exceed one hundred pounds of gold. This right has no

---

the continuance is within the discretion of the court a very clear case of abuse of discretion must be shown to authorize a reversal. Lewis v. Williams, 15 T., 47; Byne v. Jackson, 25 T., 95; Baldessore v. Stephanes, 27 T., 455; McMahan v. Busby, 29 T., 191; Wiggins v. Fleishel, 50 T., 57; Allyn v. Willis, 65 T., 65; M. P. Ry. Co. v. Christman, 65 T., 369; Guy v. Metcalf, 83 T., 37; T. & P. Ry. Co. v. Hall, 83 T., 675; Hannah v. Chadwick, 2 App C., sec. 518.

**Note 32.**—Fulton v. Craddock, p. 458.

As a general rule, an appellate court will not disturb a verdict if there is any evidence to support it. French v. Wall, 2 T., 288; Edrington v. Kiger, 4 T., 89; Shackelford v. Wheeler, 7 T., 553; Cheatham v. Riddle, 8 T., 162;

existence in three cases, viz: 1. Where the widow lives licentiously. 2. Where she is married a second time. 3. Where she remains the usufructuary. Where she marries a second time before or after the year of widowhood, she will lose the (propeidad) legal title of the property belonging to her for her marital fourth, and it will be transmitted to the heirs of the husband; but she will, during life, have the usufruct of the property. It will be observed that the author in express terms makes no distinction between the cases of the widow's marrying within or after one year from the death of her husband; the presumption then is irresistible that, at the period when that commentator wrote, no such distinction existed in the laws of Spain. Let us also examine into the full extent of the author's position; for although the words "heirs of the husband," in the latter part of this quotation, are general terms and would ordinarily embrace all persons capable of inheriting the property of the deceased, yet comparing together the separate portions of this section, I can not perceive that the established rules of construction would be violated by limiting the words "heirs of the husband" to his children. The author only presents the case where the children are rich and the widow is poor; no allusion is made to the circumstance of the husband dying without children; and since such a condition of things does not appear to have been in the contemplation of the writer, the terms employed could not properly be extended to include persons not within the scope of his consideration. If this be the proper construction of the remarks of Febrero, they have no application to a case where the widow marries again, their being no children of the former marriage. We are not, however, left to speculate as to what the law is or should be under such a state of facts. According to some later authorities, the fourth part of the husband's property under such circumstances belongs entirely to the widow. Sala, in the Glustra Cion del Derecho Real de Espana, lib. 11, title 8, 2d vol., p. 61, Mexican edition of 1832, after describing the property (including the marital fourth) which the surviving partner of the matrimonial community is bound to reserve in favor of the children of the anterior marriage, so that although the survivor enjoys the usufruct, yet the goods can not be hypothecated or disposed of, then proceeds to say that this obligation to reserve (the legal title) ceases when there are no children in existence at the time of the death of the partner whose duty it is to do so; unless there be descendants of the children in whose favor the obligation will still subsist. The obligation also ceases if the dying partner consent that the survivor shall again marry, or if the children who

Russell v. Mason, 8 T., 226; Bridge v. Ballew, 11 T., 269; Latham v. Selkirk, 11 T., 314; Oliver v. Chapman, 15 T., 400; Scranton v. Tilley, 16 T., 183; Gammage v. Trawick, 19 T., 58; Baker v. Clepper, 26 T., 629; McGloin v. Vabderlif, 27 T., 366; Ward v. Bledsoe, 32 T., 251; Linney v. Peloquin, 35 T., 29; Simmonton v. Forrester, 35 T., 584; G. H. & S. A. Ry. Co. v. Bracker, 59 T., 71; Flannagan v. Pearson, 61 T., 302; Hanrick v. Dodd, 62 T., 75; Hamman v. Willis, 62 T., 507; H. & T. C. Ry. Co. v. Lee, 69 T., 556; Stitzle v. Evans, 74 T., 596; Western Union Telegraph Co. v. Jones, 81 T., 271; Blackburn v. Knight, 81 T., 326; G. C. & S. F. Ry. Co. v. Johnson, 10 T. C. A., 254; T. M. R. Co. v. Crowder, 25 T. C. A., 536; Burns v. M. & P. Oil Co., 26 T. C. A., 223; Lichenstein v. Lowenstein, 2 U. C., 382; Giltner v. Waters, 2 U. C., 513; Vance

are to derive the profit from the reservation give their consent. In such cases the surviving partner would retain the legal title, which otherwise would be lost by the new marriage. In a late work entitled the "El Diccionario de Legislacion," under the term "cuarta marital," we find the rules of law applicable to this subject, expressed in positive and distinct terms. The term "cuarta marital" is defined as follows. "El derecho que tiene la vinda a la cuarta parte de los bienes de sudifunto marido en el caso de quedar pobre sin dato, legado, ni otros bienes can que alimentarse. La cuarta marital corresponde a la vinda hasta la cantidad de cien libras de oro (102,705 reales y 30 maravedis vellon) aun cuando queden higos de este matrimonio, aun cuando con su trabajo pueda janar el sustento, aun cuando adquiera algunos lienes despues de la muerte de su marido, aun cuando su marido cleque et quinto, si este no alcamza para sus regulares alimentos, tanto en el caso do que el marido habiere hecho testamento como en el de que habiere muerto intestado, pues es una denda legal a cuyo payo estan sujitos todos los bienes del difunto. Pasando la vinda a segundas nuccias, esta obligada a reservar a los hijos la propriedad de la cuarta y gozara' solamente a su usufruto, mientras viva; pero a falta de hijos la hara suga enteramente." Sc. p. 156.

["The right which the widow has to the fourth part of the property of her deceased husband, when she is poor, without any dowry, legacy, or other goods with which to support herself. The marital fourth is due to the widow until it amounts to one hundred pounds of gold (102,705 reales and 30 marevedis vellon) although there may be children of the marriage; although she could with her labor support herself; although she may have acquired some property since the death of her husband; although her husband may be bequeathed to her the fifth, if this were not sufficient for her accustomed alimony; as well also when the husband shall have made a will, as when he shall have died intestate; since it is a legal debt, to the payment of which is subjected all the property of the deceased. The widow being married the second time is under obligation to reserve to the children (the propeidad) legal title of the fourth, and shall enjoy only the usufrust as long as she may live; but on failure of children, it shall become entirely her own."—Sc., 156.] In neither the works of Sala nor in the "El Diccionario de Legislacion" do we find any distinction drawn between the cases of remarriage within or after the first year of widowhood. From an examination of the above authorities we are authorized to consider the following as established principles and rules in Spanish jurisprudence, viz: That the prohibitory and final law forbidding marriages within one year from the death of the

v. Saathoff, 2 U. C., 658. Though the evidence is conflicting. Hall v. Hodge, 2 T., 323; Legg v. McNeill, 2 T., 428; Perry v. Robinson, 2 T., 490; Cotton v. Campbell, 3 T., 493; Green v. Hill, 4 T., 465; Carter v. Carter, 5 T., 93; Davidson v. Edgar, 5 T., 492; Cunningham v. State, 5 T., 440; Chevallier v. Brewer, 6 T., 398; Coles v. Perry, 7 T., 109; James v. Wilson, 7 T., 230; Horton v. Reynolds, 8 T., 284; Long v. Steiger, 8 T., 460; Stewart v. Hamilton, 19 T., 96; George v. Leonard, 19 T., 150; Cummins v. Rice, 19 T., 225; Montgomery v. Culton, 23 T., 156; Anderson v. Anderson, 23 T., 639; Baldridge v. Gordon, 24

husband, is annulled and reversed. 2. That where there are children in existence of the anterior marriage, the poor widow on her marriage will only enjoy the usufruct of the fourth part of her deceased's husband's property; but where there are no children of the former marriage, nor their descendants, the legal as well as the equitable title to the fourth vests in the widow and it becomes entirely her own.

This fourth must not exceed one hundred pounds of gold, and this is computed to amount to 102,705 reales and 30 maravedis vellon.

It may well be doubted whether the widow be not entitled to deduct the fourth from the whole of the property of the deceased husband, and whether the judgment of the court below be not erroneous, so far as it orders the award to the widow of the fourth only of the balance of the estate remaining, after the payment of all just claims against the same. But as this objection was not raised in argument, and as we have neither the means nor the time to investigate difficulties which have not presented themselves to the counsel, we will not take the question into consideration.

These remarks are made in order that this point may not be considered as concluded, should a controversy similar to the present ever arise for adjudication.

It is ordered, adjudged and decree that the judgment of the court below be affirmed, and the appeal dismissed at the costs of the appellant.

*Affirmed.*

## No. VI.

### PHILLIP WEPPLER v. ANN MCMILLAN.

*Appeal from Robertson.*

OCHILTREE, JUSTICE.—We find on an examination of the transcript in this case that there was a finding by the jury impaneled to try this cause, but no judgment was entered thereon. This court has more than once decided that it can not take jurisdiction of a case in which there has not been a definitive judgment rendered in the court below. The appeal must therefore be dismissed at appellant's cost.

*Dismissed.*

T., 288; Howard v. Ray, 25 T., 88; Young v. Read, 25 T. Supp., 113; Adams v. George, 25 T. Supp., 374; Ranger v. Harwood, 39 T., 139; Robinson v. Davenport, 40 T., 333; Tarkington v. Brousard, 51 T., 550; Guerrin v. Patterson, 55 T., 124; Zapp v. Michaelis, 58 T., 270; Owens v. M. P. Ry. Co., 67 T., 679; Howard v. Kopperl, 74 T., 494; Mutual Life Insurance Co. v. Hayward, 88 T., 315, 327; Adkinson v. Garrett, 1 App. C., sec. 46; Wilson v. Green, 1 App. C., sec. 99; Mitchell v. Dallas City Gas Light Co., 1 App. C., sec. 133; Viviola v. Kuezek, 1 App. C., sec. 634; Faulkner v. Warren, 1 App. C., sec. 663; Wisson v. Baird, 1 App. C., sec. 712; G. C. & S. F. Ry. Co. v. Holt, 1 App. C., sec. 839; Booth v. Case, 1 App. C., sec. 1029; Texas Express Co. v. Dupree, 2 App. C., sec. 319; Duffard v. Herbert, 2 App. C., sec. 612; Paris Gas Light Co. v. McHamm, 2 App. C., sec. 652.

**Note 33.**—Ballard v. Rogers and Ward, p. 460.

Injunction will not lie to enjoin execution, unless all legal remedies have been exhausted. Clegg v. Darragh, 63 T., 357; Gillis v. Rosenheimer, 64 T.,

## No. VII.

### REPUBLIC OF TEXAS v. LEWIS GOODWIN.

*Appeal from Bastrop.*

OCHILTREE, JUSTICE.—Goodwin was indicted at the fall term, 1839, of the District Court of Bastrop County, for knowingly permitting the game of faro, a banking game, to be dealt in his house, contrary to the statute, etc. He was afterwards tried by a jury, who brought in a verdict of guilty.

The indictment and proceedings in the case were certified to this court by the presiding judge, as presenting questions of novelty and doubt.

After a careful investigation of the record, we see nothing which requires our interference, and are of opinion that the judgment of the court below be in all things affirmed.

*Affirmed.*

## No. VIII.

### WESCOTT v. MENARD & CO.

**(See Note 46.)**

*Appeal from Galveston.*

BAYLOR, JUSTICE.—Menard & Co. sued Wescott in the court below for the recovery of $401.57, due by promissory notes; and obtained a judgment against him for that sum in the following words, to wit:

"This day came the parties by their attorneys, and the defendant withdraws his plea and says nothing in bar cr preclusion of the plaintiff's action. It is therefore considered by the court that the plaintiff recover of the defendant," etc.

To reverse which this writ of error is prosecuted. The counsel for the plaintiff urges four grounds for reversing the judgment:

1. No citation appears to have been issued.

2. The record shows no service of writ or petition, nor acknowledgment of service of either.

3. Nor does it exhibit (except by implication in the very judgment purporting to be founded on it) any appearance by defendant below.

4. The record makes no exhibition of the note sued on and described in the petition, and furnishes no proof wherewith the allegations of the plaintiff are at all supported, or upon which the judgment was or could be legally based.

---

243; Kennard v. Mabry, 78 T., 151; T. M. Ry. Co. v. Wright, 88 T., 346; Cook v. T. & P. Ry. Co., 3 T. C. A., 145; Texas Land and Mortgage Co. v. Worsham, 5 T. C. A., 245; H. E. & W. T. Ry. Co. v. Ellison, 14 T. C. A., 706.

The points thus presented will be briefly considered. The first, second and third errors assigned may well be considered together. They in substance object that copies of the citation and petition were not served on Wescott, and yet proceedings were had and judgment rendered against him.

This objection would be deemed fatal, unless it is cured by his appearance (without service of the process). But the record states that he appeared by attorney, withdrew his plea, and said nothing in bar or preclusion of the right of Menard & Co. to recover against him. We can not falsify the record, and are therefore bound to take it that Wescott appeared and consented to the judgment.

A voluntary appearance supersedes the necessity of service of process, which is intended to procure an appearance; the want of service can not therefore be urged in this case as error.

The fourth error assigned raises the question whether this court ought to affirm the judgment of a court below, when the record here does not show a copy of the note sued on. If the judgment was in fact obtained against Wescott without producing the note on the trial below, he ought then to have objected; but the record shows no such objection. We deem it now too late for him to do so, as we must suppose the district court would not have given judgment unless the judge below had the necessary proof to have authorized it.

But for the sake of a correct practice we think it proper to add that wherever written instruments of any kind are made the foundation of an action, such instruments ought always to be produced on the trial and regularly filed at the time the judgment is obtained. Should they afterwards be wanted for other purposes, a motion ought to be made to the court for permission to withdraw them by leaving copies on file, and this motion should appear on the records of the court. Judgment affirmed.

*Affirmed.*

## No. IX.

### R. H. BRADLEY v. JOHN McCRABB.

#### (See Note 47.)

*Appeal from Victoria County.*

HEMPHILL, CHIEF JUSTICE.—John McCrabb, the plaintiff in the court below, presented his petition to the District Court for the County of Victoria at its spring term, 1841, stating that in the month of January, in the year 1838, he was duly elected to the office of clerk of the

---

Note 34.—Hamilton v. McKensie, p. 461.

Appellate court is without jurisdiction when the appeal is not taken in time. In such cases the appeal will be dismissed. Lockhart v. Lockhart, 1 T., 199; Hicks v. Harlan, 1 T., 560; State v. Croner, 2 T., 492; Keece v. Swift, 3 T., 111; Urbane v. Johnson, 3 T., 191; Reynolds v. Dechaumes, 22

district court for the said county; that he was duly qualified; exercised the duties and enjoyed the immunities of the said office until the 1st of February last; when Robert H. Bradley, the appellant in this court, by virtue of a pretended election claimed to be the lawful incumbent of said office, and that in accordance with the advice of the chief justice of said county, and the desire of his honor the district judge, and in order to the due administration of justice, and that the courts might be held without interruption, he had handed over the books, papers and records of said court and said office to the said Bradley, but denied that he had by that act transferred the rights, the perquisites, immunities, and right to said office; but retained and reserved the same to himself, until the full end and term of four years should elapse from the period of his election. He prayed for a writ of mandamus requiring the said Bradley to deliver to the said petitioner the said office with all its immunities, records, books, papers, etc., or show cause to the contrary. The petition was sworn to on the 21st of April, and on the same day there was entered of record in the said court an order commanding the said Bradley to deliver up to the said McCrabb the said office, with the immunities, books, papers, records, etc., within one day, or otherwise to show, if he could, any sufficient cause or warrant to the contrary. On the following day the respondent returned, or showed for cause why he ought not to be required to deliver up to the said plaintiff the said office, with the books, records, immunities, etc., and why a peremptory mandamus should not issue:

1. That the said plaintiff had other remedies at law.

2. The respondent had not good, sufficient, legal and timely notice of the suit of the said McCrabb.

3. That the said McCrabb was only elected (if he ever was legally elected, which defendant denied) to fill an unexpired term terminating on the 1st day of February, 1841.

4. That at an election held in conformity with law on the 1st day of February, 1841, to fill the said office for the said county the said respondent received the largest number of votes for the said office; that he had been duly commissioned as clerk of the said court by the President of the Republic; and that by virtue of the authority thus vested in him he has taken possession of the records, books and papers of the said office; and has continued ever since in discharge of the duties of the same; and prays for a rescission of the order entered of record as aforesaid.

The right of trial by jury was waived, and the cause being submitted to the court, a peremptory mandamus was ordered to be awarded, commanding respondent to yield up to the plaintiff the office and franchise

T., 116; Hall v. Claiborne, 27 T., 217; House v. Bennett, 40 T., 346; Wilson v. Adams, 50 T., 5; Warren v. Wooters, 52 T., 568; Mills v. Paul, 1 T. C. A., 419.

**Note 35.**—Republic of Texas v. Young, p. 464.

A colonist was not entitled to a grant as head of a family, unless his family was resident in Texas. Land Commissioner v. Ball, Dal., 366; Land Commissioner v. Reily, Dal., 381; Land Commissioner v. Walling, Dal., 524;

(505)

of clerk of the said court with all the immunities, books, papers, archives of said office, to be used, held and kept by the said McCrabb until the full end and expiration of his office, viz., for four years from and after the 10th day of January, 1838.

From this decision the respondent has appealed. As no argument has been made in this cause, nor brief offered by counsel, we will proceed to consider the objections to the judgment of the court below in the order of their arrangement in the return of the respondent.

And first that the plaintiff was not entitled to this writ, he having other remedies at law. As this application was subsequent to the passage of the statute of this Republic requiring judges, in issuing writs of mandamus, to observe the rules which govern such writs at common law as modified by the statutes of this Republic, we will proceed to consider whether at common law mandamus would be the appropriate remedy of the wrong complained of in this controversy. The writ of mandamus, according to the theory of the British Constitution and of the common law, is deemed a prerogative writ of an extensively remedial nature, and has been figuratively styled "one of the principal flowers of the jurisdiction of the king's bench," in which the king once sat in person, and is by legal fiction still presumed to be present. See 1 Chitty's General Practice, p. 79; Kendall v. United States, 12 Pet., 620.

Among an infinite number of other purposes to which this writ may be applied, it lies to compel the restoration or admission of anyone entitled to any office or franchise of a public nature, whether the same be spiritual or temporal, and also for the production, inspection and delivery of public books and papers. See Black. Com., p. 110; Bac. Ab. Mand.; 2 Tomlin's L. Dic., p. 512. In 3 H. and M., 1, 47, it was decided to be a proper remedy to restore to his office a clerk of a court who has been ousted therefrom by the illegal appointment of another person. See 2 Tucker's Com., p. 202. It will not only issue in cases where the party having a specific legal right has no other legal operative remedy, but where the other modes of redress are inadequate or tedious, the writ will be awarded. 3 Black. Com., p. 110; 1 S. C. (Tread. Ed.), p. 175; 4 Burr, 2044; 3 Burr, 1266. One of the reasons for the abundant caution in the exercise of this jurisdiction under the common law, and the restriction of its application to cases where there was no other legal, specific and operative remedy, was the final character of the judgment awarding the writ of mandamus; as no writ of error lay by which

Republic v. Skidmore, Dal., 581; Langford v. Republic, Dal., 588; Republic v. Inglish, Dal., 608; Johns v. Republic, Dal., 621; Grooms v. State, 1 T., 568; Republic v. Skidmore, 2 T., 261; Tichnor v. State, 2 T., 269; Lewis v. Ames, 44 T., 319, 345; Lott v. King, 79 T., 292; Hill v. Moore, 85 T., 335; Byrn v. Kleas, 15 T. C. A., 205; Union Beef Co. v. Thurman, 70 Fed. Rep., 965. An unmarried colonist under twenty-one years of age, was not entitled to a headright grant. Lockhart v. Republic, 2 T., 127. But it will be presumed from the fact that a headright certificate was granted by the proper authority, that the grantee was the head of a family, and evidence is not admissible in a collateral proceeding to show that he was not married and that his family was not in Texas. Johnston v. Smith, 21 T., 722; Bowmer v. Hicks, 22 T., 155; Howard v. Colquhoun, 28 T., 134; Burkett v. Scarborough, 59 T., 495; Capp v. Terry, 75 T., 391; Boone v. Hulsey, 71 T., 176; Hill v. Moore, 85 T.,

it could be subjected to the revision of a superior tribunal. But under
our Constitution and laws the defeated party is entitled to an appeal
from any final judgment rendered in the district courts; and the jealous
caution which might arise from the influence of apprehensions that
remediless wrongs might be committed, can have no foundation or sup-
port in the structure of our judicial system. It is true that at common
law the writ of quo warranto will lie in the name of the king or the
Republic against any person or corporation, as well for the usurpation
as for the nonuser or abuse of any franchise or liberty, to show by what
warrant or title they claim such right or franchise. And had an infor-
mation in the nature of a quo warranto been filed in this cause, we will
not say that the same could not have been sustained; but where the
object is not only to restore to office him who has been illegally ousted,
but also to cause the books, papers and archives thereof to be delivered
to his possession, we are of opinion that the writ of mandamus operates
a more complete and effectual remedy.

The next objection, that the respondent did not receive sufficient legal
and timely notice, will be found untenable. Were the seventh section
of the act establishing district courts alone consulted, we might hastily
conclude that all process issued in the course of judicial proceedings
must be served at least five days before the next term succeeding the
issuing of said process. But when construed with other portions of
the same statute, such a conclusion will be found incompatible there-
with, and the provisions of the said section must necessarily be restricted
to the ordinary process obtained from the ministerial officer of the court,
without the intervention of judicial power. Any other construction
would in a great measure paralyze judicial authority and render it too
imbecile for the effectual administration of justice or the redress of
wrongs. By the fourth section of said act, Congress in conformity with
the provisions of the Constitution has communicated to the district
courts the most high and transcendent authority in both civil and crim-
inal matters, limited and confined only by appeal to this tribunal. The
judges are in express terms empowered either in vacation or term time
to grant writs of habeas corpus, mandamus, injunctions, supersedeas
and all other remedial writs known to the law, not repugnant to the
Constitution, returnable according to law into the Supreme Court, or
either of the said district courts, as the case may be. Under other cir-
cumstances it might be profitable to inquire whether the legislators by
the use of the terms injunction, mandamus, supersedeas, etc., intro-
duced or intended to introduce all the principles and rules by which
these writs are governed at common law. In Aques v. Indice, 3 Martin,

---

335; Byers v. Wallace, 87 T., 503. Grant is valid if the grantee in good faith
intended to move his family to Texas. State v. Skidmore, 5 T., 459; Russell
v. Randolph, 11 T., 460. Acts of December 14, 1837, and February 4, 1841,
required applicant to prove that he did not refuse to participate in the war
and that he did not assist the enemy; and if applicant's intention of remain-
ing while in the Republic, and certainty of returning on departure, were
equivocal, he was not entitled to establish claims for donations of land.
Republic v. Skidmore, Dal., 581; State v. De Casinova, 1 T., 401; Thomerson

171, it was decided that the use of common law names in judicial proceedings were naturally adopted in a practice carried on in the English language, but that they should rather be considered the translation of names formerly used, than as emanations from English jurisprudence. That the words mandamus, procedendo, certiorari, prohibition, etc., sometimes employed in practice, may be considered good equivalents for incitation, evocation, inhibition; but that their adoption as words could by no rule of law or common sense be considered as having introduced the English practice itself. But however interesting might be the examination of this subject when a proper case is presented, the present controversy could not be affected by the practice in relation to remedies of a similar nature in courts deriving their jurisdiction from the civil law. By subsequent legislation, the judges were required in the issuance of the writs of mandamus to be directed by the rules which govern such writs under the common law, as modified by the statutes of this Republic. To the common law and to our statutes, then, must we apply for the decision of the question, whether the order or alternative writ of the mandamus issued in this case should have been served five days before the commencement of the term of the court, or whether the same was properly issued in term time and returned at the same term. In deciding on the proper practice to be pursued under our laws and the organization of our courts, we derive but little assistance from an examination of the practice of the common law courts in England; nor has that practice by the introduction of the common law become of force in this country, and the decisions thereon are no further binding here than as they are applicable to the structure of our courts of justice. There the terms of the courts are frequent and long continued; and the difference between the time of the test and the return of the writ varies according to the distance of the respondent from the place where the sessions of the courts are held. Here our courts are held but twice in the year. The term of many of them does not exceed six days, which is two days less than the minimum period allowed in England between the teste and return of the writ of mandamus. The dissimilarity between the organization of the English and our courts is so great that no deduction can be shown from the English practice as to the proper period of notice under our judicial establishment. The question then arises, whether on a just interpretation of our statute laws (considering the powers of the district courts and the objects to be obtained by the application of the remedy), a writ of mandamus can be returned to the same term from which it issued? This question

v. State, 8 T., 172; Russell v. Randolph, 11 T., 460; Patton v. Evans, 15 T., 363.

**Note 36.**—Thompson, Morton and Payne v. Harrison, p. 466.

Gaming and wagering contracts are invalid only when prohibited by statute or induce immorality. Dunman v. Strothers, 1 T., 89; Smith v. Brown, 3 T., 360; McElroy v. Carmichael, 6 T., 454; Kirkland v. Randon, 8 T., 10; Crump v. Secrest, 9 T., 260; Pierce v. Randolph, 12 T., 290; Norvell v. Oury, 13 T., 31; Campbell v. Reeves, 14 T., 8; Boggess v. Lilly, 18 T., 290; Connor v. Mackey, 20 T., 747; Wheeler v. Friend, 22 T., 683; Monroe v. Smelly, 25 T., 586;

will admit of but one answer. If we examine the usages of other courts where common law prevails, we will find that the rule to show cause, the alternative and peremptory mandamus have all been granted at the same term of the court. The same provision which authorizes judges to issue writs of mandamus gives authority also to issue writs of habeas corpus, requiring them both alike to be returned to the district court. It surely would not be contended that a writ of habeas corpus issued at one term of the court could not be returned until the succeeding term thereof. Such a construction would render nugatory this great instrument of human liberty, and a similar one would vitally impair the remedial efficacy of the writ of mandamus. It is the daily practice of courts to issue writs returnable to the same term, and the exercise of such power is essential to the due, prompt and vigorous administration of justice. Writs are issued for the apprehension of criminals, attachments for contumacious witnesses, and many other processes, returnable immediately, or at a day fixed in the said term. If the writ of conditional mandamus could not be returned at the same term at which it was issued, one of the objects of the adoption of that remedy, viz., the speedy attainment of justice, would be defeated; for no other mode of redress could be more tedious or protracted. The processes in mandamus are of an extraordinary nature and require the intervention of a judge, and as to the period of their return can not well be assimilated to the ordinary writs obtained from the ministerial officers of the courts; but in the absence of distinct statutory provisions, the day of return ought to be regulated by the objects to be accomplished and the usages of courts similarly situated. Nor can the exception be sustained because there was no rule to show cause and no conditional mandamus in fact issued. The circumstances of this case as developed by the evidence were peculiar.

The claimant, McCrabb, had delivered the papers and books of the office to the respondent at the request of the presiding judge, that there might be no failure in the administration of justice; it being understood that at the earliest opportunity, on proper proceedings being instituted, the right would be decided.

The respondent acted as clerk of the court, and recorded the order directing him to yield up the office, with its papers and books, etc., or show cause on the next day to the contrary. His answer shows notice of the existence of the order. Where the probable cause is manifest the court is authorized as the primary measure to issue the alternative mandamus; and as the making out of the writ in form by the respondent

Knight v. Gregg, 26 T., 506; Armstrong v. Parchman, 42 T., 185; Walker v. Armstrong, 54 T., 609; Seeligson v. Lewis, 65 T., 215; Floyd v. Patterson, 72 T., 202; Oliphant v. Markham, 79 T., 543; Beer v. Landman, 88 T., 450; Lewy v. Crawford, 5 T. C. A., 293; Tuckett v. Herdic, 5 T. C. A., 690; Lovejoy v. Kaufman, 16 T. C. A., 377; Henson v. Flannigan, 1 App. C., sec. 566; Fowler v. Chapman, 1 App. C., sec. 963; Donnelly v. Bank, 3 App. C., sec. 169; Stewart v. Miller, 3 App. C., sec. 292; Marx v. Elsworth, 2 U. C., 83.

**Note 37.**—Horton v. Jones, p. 466.

On dissolution of injunction, plaintiff is entitled to have petition continued over for final trial on merits. Hall v. Phelps, Dal., 435; Hanchett v.

and having it served on himself would have been idle and troublesome ceremony without any conceivable advantage, we can not think that on these grounds the exception for want of notice is supported. The order of procedure in suing out writs of mandamus is very clearly prescribed in 3 Black. Com., p. 111, and ordinarily it should be pursued; but the circumstances of this case and the official situation of the respondent rendered other steps than the order of the court and his notification thereof unimportant and superfluous. It has been decided that where a mandamus is sought to restore to office a clerk who has been ousted therefrom, that the person occupying the office ought to be made a party to the conditional rule or mandamus, and it ought to be served upon him that he may be warned to appear and defend his right. But if it appear from the record that he was apprised of the proceedings it will be sufficient. 3 H. and M., 1, 47; 2 Tuck. Com., p. 202. The defendant was warned of the proceeding, and can not properly allege want of notice. The next and most important question is, whether the said claimant McCrabb was entitled to hold his office for the full end and term of four years from and after the period of his election. The depopulated counties, from causes over which they had no control, were not organized nor county officers elected on the first Monday in February, 1837, as was prescribed by law; and they were specially empowered by a supplemental act passed June 12, 1837, to hold elections for county officers at such time as they might deem proper. Under the provisions of this supplemental act, an election was held on the 10th of January, 1838, in Victoria County, but the evidence whether the writs and notices of election purported that the same was to be had for a full term of office or an unexpired portion thereof was conflicting and variant. It will not be material to weigh and endeavor to reconcile the variant testimony on this point, as the important principles which are decisive of this controversy can not be affected or modified, even if it were incontrovertibly established that the election was had for an unexpired portion of the term of the office in dispute; nor can the act of the claimant in voting or being a candidate for a re-election in February, 1841, affect his rights—for if he were entitled under the laws of the land to hold his office for four years, the election to fill an office which was not vacant was a nullity, and without force and effect. Section 6, article 4, of the Constitution provides "that the clerks of the district courts shall be elected by the qualified voters for members of Congress in the counties where the courts are established, and *shall hold their offices for four years,* subject to be removed by presentment of a grand jury and conviction of a petit jury." The terms of this pro-

Gray, 7 T., 549; Fulgham v. Chevallier, 10 T., 519; Lander v. State, 12 T., 462; Hurnley v. Cook, 13 T., 586; Eccles v. Daniels, 16 T., 136; Sims v. Redding, 20 T., 386; Dangerfield v. Paschal, 20 T., 536; Edrington v. Allsbrooks, 21 T., 186; Dearborn v. Phillips, 21 T., 449; Floyd v. Turner, 23 T., 292; Baldridge v. Cook, 27 T., 555; Grant v. Chambers, 34 T., 573; Aiken v. Carroll, 37 T., 73; Hewett v. Thomas, 37 T., 520; Pullen v. Baker, 41 T., 419; Kelley v. Whitmore, 41 T., 647; McKay v. State, 44 T., 43; Gaskins v. Peebles, 44 T., 390; Bridges v. Cundiff, 45 T., 437; Watt v. White, 46 T., 338; Snow v. Nash, 50 T., 216; Texas Land Co. v. Turman, 53 T., 619; Hale v. McComas, 59 T., 484; Washing-

vision are so plain that by no admitted rules of interpretation could the tenure by which this office is held be abridged or curtailed to a shorter period than four years. There is no analogy between term of the office of the district clerk and the fixed and definite periods for the commencement and termination of senatorial offices. The senators are ordered to be classified; the seats of the first class to be vacated at the end of the first year, the second at the end of the second year, etc., in such manner that one-third shall be chosen each year. Should a vacancy occur in the seat of any one member of a class, provision is made for filling the same, but the terms of office of the entire class continue until, and can only expire at stated periods. The time at which the senatorial term commences is fixed, and whether there be one or twenty incumbents it is also fixed, that it must expire at the end of three years. But can it be inferred by any legitimate rules of deduction that the tenure by which a clerk of the district court holds his office has any dependence on or connection with the period at which a former incumbent may have been elected to the said office, or the length of time for which he may have held the same? There is nothing in the terms of the Constitution which can militate against the plain and just conclusion that the person appointed by the elective power to the office of district clerk is entitled, whensoever he may be elected, to hold the same for four years. It can not therefore be material in point of fact to ascertain whether McCrabb was elected for a less or even a greater period than the term of four years. The Constitution prescribes the tenure of his office, and under its high guarantees he could not be disturbed even by a solemn act of legislative authority, without subverting the fundamental principles of our social compact; and if his constitutional rights could not be impaired by legislative action, they surely could not be subverted by mistakes of ministerial officers ordering the election, or the misapprehension of electors as to the period of duration of the office. This is an office created and its tenure and mode of appointment prescribed by the Constitution; and when the clerk is once elected, he is in office under that instrument, and entitled to all the rights and immunities conferred thereby. State v. Syles, 1 McCord, p. 238; State v. Hutson, Id., 240.

The question whether the legislative authority can constitutionally authorize the election of a clerk for a less period than a term of four years, does not perhaps properly arise from the construction of section 47 of the act establishing the district court. That authorizes an appointment by the district judge, when the office is vacant of a clerk pro

ton County v. Schulz, 63 T., 32; Love v. Powell, 67 T., 15; Daugherty v. Gibbs, 2 U. C., 255; Wagner v. Edmiston, 1 App. C., sec. 678.

**Note 38.**—Sloo & Byrne v. Powell and Others, p. 467.

[1] Is a harsh and summary remedy and all precedent conditions must be strictly complied with. Raquet v. Nixen, Dal., 386; Fowler v. Poor, Dal., 401; Gregg v. York, Dal., 528; Sydnor v. Chambers, Dal., 601; Wooters v. McGee, 1 T., 17; Chevallier v. Williams, 2 T., 239; Caldwell v. Haley, 3 T., 317; Sydnor v. Tetman, 6 T., 189; Marshall v. Alley, 25 T., 342; Culbertson v. Cabeen, 29 T., 247; Sheffield v. Gay, 32 T., 225; Moody v. Levy, 58 T., 532; Evans v. Tucker, 59 T., 249; Stiff v. Fisher, 2 T. C. A., 346; Sarrazin v. Het-

tem., until a regular election shall be held. But there is nothing in that section to justify the conclusion that the Legislature intended that a clerk, when elected, shall hold his office for a less term than the constitutional tenure. We express no opinion as to the proper power from which the district clerk should receive his appointment or authority, as that question was not presented in this controversy. Should any embarrassment arise from the present legislation on this subject, it will be in the power of Congress at any time to afford the remedy. We are of opinion that the judgment below should be affirmed, and it is hereby ordered, adjudged and decreed accordingly.

*Affirmed.*

## No. X.

### RICHARD ROMAN v. JAMES A. MOODY.

#### (See Note 48.)

*Appeal from Victoria.*

HEMPHILL, CHIEF JUSTICE.—The relator, James A. Moody, in his petition states that he was duly elected clerk of the County Court of Victoria County, in the month of January, 1838, and held the said office until the 1st of February, 1841; when an election being held to fill said office contrary to law, Richard Roman was chosen the incumbent thereof, and the said Roman having applied for the records of the said office, the relator, considering that he was still lawfully in office, refused to deliver them, until being ordered and advised to that effect, that the public business might proceed without hindrance, he surrendered the said papers, books, etc., reserving, however, the right and title of said office, with all its immunities, until the full end of four years from the period of his election. He prayed for a mandamus to compel the said Roman to deliver to him the said office with its records, books, immunities, etc., or show cause to the contrary. The alternative order or mandamus being issued, requiring a compliance with the prayer of the petition or show within one day sufficient cause or warrant for the refusal, the respondent appeared; and it was agreed that the cause should be submitted to the decison of the court in the same manner as was the case of the district clerk (McCrabb v. Bradley), the only point of distinction between the two cases arising from the fact that one office was created by the Constitution and the other was the creature of the law. The testimony of the witnesses was in all respects the same as was given in the case of McCrabb v. Bradley, the relators, McCrabb and Moody, having been elected to the respective offices of district and

---

mann, 16 T. C. A., 351; Ball v. Bennett, 21 T. C. A., 399; Dreiss v. Faust, 1 App. C., sec. 33; Whitley v. Jackson, 1 App. C., sec. 575; Schwarz v. Burton, 1 App. C., sec. 1216; Scram v. Duggan, 1 App. C., sec. 1269. No presumption will be indulged to supply defects. City Nat. Bank v. Flippen, 66 T., 610; Focke v. Hardeman, 67 T., 173; Perrill v. Kaufman, 72 T., 214; Moore v. First Nat. Bank, 82 T., 537. But literal exactness is not required. Lewis v. Stewart, 62 T., 352.

county clerks on the same day. No statement of facts is sent up with this record, but reference is made to the case of McCrabb for the proof which was adduced. The court awarded a peremptory mandamus against the respondent, and an appeal was taken from the decision. As was stated in the opinion delivered in the case of McCrabb, the testimony, whether the election held in 1838 was to fill the respective offices for their entire terms or unexpired portions thereof, was variant and conflicting; the court below being of opinion that the weight of testimony was in favor of the affirmative, or that the officers were elected for a full term.

We will not enter into an examination of the evidence for the purpose of comparing the same and deciding upon the correctness of the conclusion of the court below in relation to that matter. The judgment of this court would not be modified by the establishment of the one or the other fact, as we are of opinion that the tenure of this office being prescribed by law would not be varied, extended, or diminished by any misconception of the electoral body, as to the period of duration of the office. As the Constitution has not provided for the establishment of the tenure of the office of the clerk of the county court, the law creating the office and fixing its mode of appointment and its tenure must furnish the rule for decision in this controversy. By section 8 of the "act organizing the inferior courts and defining the powers and jurisdiction of the same," page 150, Laws of Texas, volume 1, it is enacted, that there shall be elected by the qualified electors of each county on the first Monday of February next, one clerk of the county court, *who shall hold his office for the period of four years, etc.* There was no election holden in the county of Victoria to fill the office in dispute on the first Monday in February, 1837, as directed by the above law; and for the relief of this and other counties similarly situated, a statute was approved June 12, 1837, authorizing the chief justices of such counties to give notice and hold elections therein for county officers at such time as they might deem proper and in the manner prescribed by law. No allusion is made to the period or term for which the officers elected under the authority of this law shall hold their offices, and the question then arises, whether a clerk of a county court elected by virtue of this latter statute shall hold his office for the period of four years from the date of his election, or only from the space of time intervening between his election and the expiration of four years from and after the first Monday in February, 1837. The act organizing the county courts, above referred to, authorizes the clerk to hold his office for four years. It is true that an election

---

[2] At common law, the seal is an absolute requisite to the validity of a bond. Cayce v. Curtis, Dal., 403; Sloo v. Powell, Dal., 467. It is unknown to the civil law and not essential to the validity of obligations and other instruments. Cayce v. Curtis, Dal., 403; Cayce v. Horton, Dal., 405; Foster v. Champlin, 29 T., 22. The common law term "bond" has never been adopted in this State and it is not necessary for bonds to have private seals. Foster v. Champlin, 29 T., 22; Courand v. Vollmer, 31 T., 397. Under Act of February 5, 1840 (Gammel's Laws of Texas, vol. 2, p. 327), providing that a scroll should take the place of a seal, provided it be recognized in the body of the instrument by the person making it, the recognition was not required to be

was directed to be had for the clerk on the first Monday in February, 1837. But we do not consider ourselves justified in concluding from the terms of the law that there is prescribed a fixed period, certain as to its commencement and termination for the office in controversy.

It is simply provided that he shall hold his office for four years, and not that it shall commence and end in prescribed days, and that should a vacancy occur, elections shall be holden only to complete the unexpired portion of this defined and circumscribed end. The terms of the provision that he shall hold his office for four years are so plain that they can not be elucidated by explanation; and since they are not modified by the subsequent statute or by other provisions of the same act, we are justified in concluding that a clerk of the county court, whensoever elected, and especially when elected under the authority of the statute passed for the benefit of the depopulated counties, is entitled to hold his office by the tenure guaranteed to him by the provisions of the general law, viz., for the term of four years. For authorities in relation to the tenure of office, see 2 Wend., 266; 1 Melord, 233; Bradley v. McCrabb, decided at this term of the court. We perceive no necessity of adding further observation in relation to the tenure of the clerk's office or to the propriety of proceedings by mandamus. They are discussed at some length in the case of Bradley v. McCrabb, and do not require repetition. It is ordered, adjudged and decreed that the judgment of the court below be affirmed.

## No. XI.

### TAYLOR v. DUNCAN.

#### (See Note 49.)

*Appeal from Gonzales.*

MORRIS, JUSTICE.—A motion has been made in this case to dismiss the writ of error granted to Taylor, because the judgment which that writ was granted to revise was rendered previous to any law authorizing such writ, and after the right of appeal, under the laws existing at the time of the rendition of the judgment, had been lost by lapse of time.

The principal questions that arise in the determination of this motion are two: First, that at the time of the rendition of this judgment, was the method known to the law of obtaining a revision in a higher court of a case adjudicated in a lower? Second, whether the laws passed subsequent to that time giving additional or enlarged remedies can be

in any specific terms. The use of any words in the body from which recognition could be fairly inferred, was sufficient. Flemming v. Powell, 2 T., 225; English v. Helms, 4 T., 228; Read v. Levy, 30 T., 738. The first section of Act of 1840 was restraining, and confined to instruments for conveyance of estates of inheritance or freehold or for a term of more than five years, and the intent to seal was sufficient, if expressed in any part of the instrument not within the purview of this section. English v. Helms, 4 T., 228; Clayton v. Pridgen, 8 T., 308; Conner v. Autrey, 18 T., 427; Muckleroy v. Bethany, 23 T., 163; Muckleroy v. Bethany, 27 T., 551; Richarz v. Wolcken, 34 T., 102.

considered as applying either directly or by implication to cases which had been previously adjudicated. The judgment in this cause was rendered in November, 1839, and upon an examination of the statute law of the Republic up to that time, we find that the only means by which a cause could be transferred from an inferior to a superior tribunal in order to its revision by the latter was an *appeal;* the terms, time and manner whereof are variously modified by different provisions in those statutes. Vide 1 vol. Stats., p. 203, sec. 15; 2 vol. Id., p. 94, sec. 1. All of these provisions require the notice of appeal to be given at the term of the court at which the appeal was prayed, and time only was extended by the amendment for the filing of the appeal bond in those instances in which it was necessary that such bond should be given. That time varied from the term at which the appeal was taken, to six days subsequent to the expiration of the term of the court at which the appeal was prayed. But it is contended that we must conclude, from words and expressions in the same statutes, that Congress contemplated some other method of obtaining a revision of the decisions of an inferior by the Supreme Court than appeal. The expressions used in the statutes and referred to as raising this presumption will be found in volume 1, page 79 (statute organizing the Supreme Court), section 3; where it is said "that the Supreme Court shall have jurisdiction over and hear and determine all manner of pleas, plaints, etc., which may be brought before it from any court in this Republic, either by appeal *or other legal process,*" etc. In section 8 "the said court or any judge thereof, in vacation, may grant writs of injunction, supersedeas, and such other writs as the laws permit to the judgments and decrees of the district or county courts, on such terms and conditions as the laws prescribe in cases of appeal, etc., returnable either to the Supreme Court or before any judge of said court, as the case may require." Section 16 requires that a copy of the bond given by the plaintiff shall be transmitted, with a transcript of the record of the cause in which such appeal was taken, or *which may be taken in any other way, to the Supreme Court.*

In volume 1 (under the law organizing district courts, page 203, section 4), the judges of the district courts are authorized, in vacation or term time, to grant writs of habeas corpus, mandamus, and *all other remedial writs known to the law,* returnable according to law, either in the Supreme Court or either of said district courts, as the case may be.

Other sections of law using similar expressions might be found, but as enough have been quoted to place the argument in a fair light before

Under Act of 1840, contracts to transfer land certificates and headright claims, were not required to be under seal. Randon v. Barton, 4 T., 289; Bledsoe v. Cains, 10 T., 455. It was not necessary for an obligation to pay money, nor its assignment, to be under seal. Durst v. Swift, 11 T., 273; Jones v. Holliday, 11 T., 412; Holman v. Criswell, 13 T., 38. Nor was it necessary for a contract to sell land to be under seal. Miller v. Alexander, 8 T., 36; Holman v. Criswell, 13 T., 38; Fisk v. Miller, 13 T., 224; Eckhart v. Reidel, 16 T., 62; Martin v. Weyman, 26 T., 460; Courand v. Vollmer, 31 T., 397; Wright v. Lancaster, 48 T., 250, 256; Downs v. Porter, 54 T., 59, 64. A deed without seal or scroll was admissible in evidence to show equitable title in vendee, and deed was entitled to record under section 7 of Act of 1840, though not under seal. Miller v. Alexander, 8 T., 36; Saunders v. Hartwell, 61 T.,

us, we shall now proceed to a consideration of its force and effect.  The legitimate method of construing the statute laws of any country is to view them in connection with reference to the fundamental law of that country, on which they must necessarily be based.  When the statutes are silent on any subject, or when doubt or difficulties arise as to the intention of the legislators in any statutory enactment, it is the duty of the courts to look to that fundamental law as the rule of decision in the one case, and the proper method of arriving at the intention of the legislators in the other.  What, then, at the time of the passage of these various statutes which have been before alluded to, was the fundamental law of the land?  The answer is plain: the Constitution of the Republic of Texas and the Spanish civil law as in force in the Mexican confederacy.  Upon these as a basis have our statutes been passed, and to these must we look as the guide of our decisions when the statutes are silent, or as the rule of construction when they are doubtful.  By reference to that law we find that appeal is the only remedy by which a party conceiving himself aggrieved by the judgment or decree of an inferior court could obtain a revision thereof in a higher tribunal.  The terms, time, and other requisites thereto are expressly given.  1 White, 308; Laws Coahuila and Texas, p. 266, art. 109.  Our statutes then, as we have seen, prescribe no other specific remedy but *appeal*.  And reference to the fundamental law of the land shows no method of appeal analogous to the remedy which has been pursued in this case.  That remedy is a writ of error, a writ strictly of common law origin, and which has once been decided by the court as an incident to that system of law, necessarily accompanying its introduction unless expressly excluded.  The argument of counsel goes to this extent, that because our Constitution provides that the common law shall at some convenient time be introduced by Congress, and because from the expressions used in the statutes before referred to, it would seem that Congress contemplated some other method of revising the decisions of the inferior courts than appeal, that therefore *that* other method was a "writ of error."  That this does not follow we must at once perceive.  At the time of the passage of those statutes and the rendition of this judgment, the "common law" had not been introduced as the law of the land; no writ of this nature was given by these statutes; none analogous to be found in the fundamental law to which we must look as the rule of decision; and were we by our decision to declare its existence, we should be traveling further than the law-making power and assuming to ourselves the legislative functions, and

679, 686; Tom v. Sayers, 64 T., 339; Frost v. Wolf, 77 T., 455.  Act of February 3, 1841 (Gammel's Laws of Texas, vol. 2, p. 608), providing that "when a husband and his wife have sealed," etc., was not applicable to sales of personal property.  Stooksberry v. Swann, 12 T. C. A., 66, 73.  Act of February 2, 1858 (Gammel's Laws of Texas, vol. 4, p. 968), dispensed with the use of seals on all private instruments, except contracts of corporations.  This statute, with the amendment of April 28, 1873 (Gammel's Laws of Texas, vol. 7, p. 503), constitute Rev. Stats. 1895, art. 4862.  Harris v. Cato, 26 T., 338; Wimbish v. Holt, 26 T., 673; Read v. Levy, 30 T., 738; Courand v. Vollmer, 31 T., 397; Bernhard v. De Forrest, 36 T., 518; Clayton v. Mooring, 42 T., 182.  Under the statute of 1858 and the present law, the following instruments are valid

by judicial act bringing forth before its time, from the legislative womb, the embryo fetus of the common law .

Upon this point then we must conclude that appeal was the only remedy ·known to our law at the time of the rendition of this judgment. Passing then to the consideration of the second point, it is contended that by the introduction of the common law the writ of error as an incident thereto has also been introduced, and even if that be not true, the statute passed in 1841 has expressly recognized it as one of the modes of appeal; and that under those laws this writ has been properly granted and can rightly be determined by this court. It is not necessary for us to determine in this cause whether by the introduction of the common law the writ of error has also been introduced, nor are we to be considered as so doing. But admit it to be so; let us then examine this case with reference to that statute, and also the subsequent statute expressly authorizing that writ. The fair and proper method of construing statutes is to give them a prospective action, having effect only on causes that may arise subsequent to their passage. Unless therefore express words be used, clearly intimating the will of the legislative body that the operation of a statute should be retrospective, the courts will not give such operation by construction. There is nothing in these statutes which either directly or by implication requires such construction at our hands. But suppose that the intention of the legislative body was that all causes previously adjudicated, where the remedy by appeal had been lost by lapse of time and laches of the parties, should by means of this writ again be revived by this tribunal if the parties so wished; such a statute would be plainly retrospective (1 Cond. Rep. U. S., p. 176) and if it affected the rights of individuals, would under our Constitution be null and void. Const., sec. 16, Bill of Rights. In the case under consideration, the plaintiff had obtained his judgment and the defendant had lost his remedy by appeal, by failing to resort to it in the time prescribed in law. The plaintiff's right had under the law become final and vested. 4 Burrow, 2, 460; 1 Part., 283, Law 19; Id., 311, Law 24; 1 White, 309, sec. 4. A law then which infringes a vested right by retrospective action is void under our Constitution; the judgment in this case was a *vested right* at the time of the passage of these laws; therefore so far as affecting that judgment they are null and void. But as we before said, we do not conceive that the remedy introduced by these laws was intended to apply to cases previously adjudicated and settled, for we can not believe that Congress would lend its aid to those who had slumbered over their rights, or that it would violate another

without seal. (a) Appeal bonds. Russell v. McCampbell, 29 T., 31; Read v. Levy, 30 T., 738; Hart v. Kanady, 33 T., 720; Boney v. Waterhouse, 35 T., 178. (b) Attachment bonds. Bernhard v. De Forrest, 36 T., 518 (overruling Read v. Levy, 30 T., 738; Courand v. Vollmer, 31 T., 397; Hart v. Kanady, 33 T., 720); Gasquet v. Collins, 57 T., 340. (c) Certiorari and sequestration bonds. Courand v. Vollmer, 31 T., 397; Clayton v. Mooring, 42 T., 182; Tompkins v. Toland, 46 T., 584. (d) Appointment of substitute trustee. Jacobs v. Mildred, 53 T., 72; Cheveral v. McCormick, 58 T., 440. (e) Official bond of county treasurer and county scrip. De Wees v. Colorado County, 32 T., 570; Parker County v. Courts, 2 U. C., 398. Written contracts of corporations should be under corporate seal, but the ancient and technical

principle, viz., that there should be some end to litigation by calling up
the specters of departed causes to pass again in review before the judicial
eye; not having expressly done so, we do not feel at liberty to construe
such to be their will by implication, especially when after so doing we
should then be forced to declare their acts unconstitutional and void.
Since the remedy, then, which existed at the time of the rendition of
this judgment had been lost to the party by lapse of time, and as the
remedies subsequently introduced must be construed as applying only
to cases adjudicated since their introduction, we conclude that the writ
of error in this case was improperly granted, and must therefore be
quashed and the cause dismissed.

*Dismissed.*

## NO. XII.

### JOHN DAVIS v. SYLVANUS HATCH.

*Appeal from Jackson.*

JACK, JUSTICE.—The appellee, Hatch, brought an action in Jackson
County against Davis for damages for a failure, as alleged in the petition
on the part of Davis, then sheriff of Jackson County, to levy an attach-
ment which Hatch had sued out against one T. S. Mayberry, and for
improperly serving other writs of attachment upon the property of May-
berry, which some other creditors of Mayberry had obtained before a
justice of the peace.  On the trial of the case below the proof was that
Hatch on the 10th of September obtained an attachment against May-
berry; that Davis, the sheriff, received the writ of attachment the same
day and levied it on the next day.  The defendant proved that on the
same day C. L. Owen, J. Brown, D. Allen and J. Murry Brown respec-
tively sued out their attachments against Mayberry, on demands cog-
nizable and returnable before a justice of the peace; that those of C. L.
Owen and J. Murry Brown were delivered orally to said Allen to exe-
cute.  That the writ sued out by Allen was delivered to said J. M. Brown
to execute on the day of their date.  That they were directed to any
lawful constable or the sheriff of the county, but there was no written
deputation made of either by the magistrate; that neither Allen nor
J. M. Brown was a qualified constable; that on the night of that day
Allen levied that delivered to him, and J. M. Brown levied Allen's
attachment.  That on the next morning, the writ of J. Murry Brown,
directed as the others, was levied by James A. Sylvester, deputy sheriff
of defendant Davis; after which, on that morning, Hatch's attachment
was levied.  That Owen, Allen and the Browns obtained judgments

rule that a corporation could act and speak only by its corporate seal is
obsolete with us.  Shropshire v. Behrens, 77 T., 275; Gas Co. v. Harber, 1
App. C., sec. 1123.  Where an agent makes a contract under seal, without
disclosing his agency, the party with whom he contracts can not elect to
hold the undisclosed principal upon the contract.  This principle is not
changed by our statute.  Rev. Stats. 1895, art. 4862; Sanger v. Warren, 91

